## DEAN *v.* NELSON.

1. A sale of stock in a company at its par value, the consideration to be paid out of the net receipts of earnings of the stock; received quarterly by the company, and a note given therefor, with the condition that the principal should become due if the instalments were not regularly paid; *held* a valid sale under the circumstances.

2. Such a condition in the note is not a penalty, but is of the substance of the contract.

3. A mortgage to secure such note being given upon the grantee's interest as a stockholder in the property of the company, the equity of redemption is not extinguished by proceedings to foreclose the same during the war, when such proceedings were taken within the Union lines, whilst the defendants were absent in the Confederate lines and were prohibited from entering the Union lines.

---

* The United States *v.* Bank of Metropolis, 15 Peters, 377.

APPEAL from the Circuit Court of the United States for West Tennessee; the case having been thus:

Thompson Dean, of Cincinnati, prior to the breaking out of the late rebellion, was the owner of a large amount of capital stock in the Memphis Gaslight Company, a corporation of Tennessee, situated and doing business at Memphis, in that State. In May, 1861, he transferred his entire stock to one Pepper, secretary of the company, to enable him (Pepper) to make some disposition of it in view of approaching hostilities.

On the 11th day of June, 1861, Pepper sold and transferred fifty shares, of $100 each, to a certain Nelson, then of Memphis, at par, receiving for the consideration Nelson's note, under seal, dated June 11th, 1861, whereby he promised to pay to the order of Pepper $5000, with interest at six per cent. per annum out of the net receipts of earnings on the sum of $5000 of the capital stock of the company, payable in quarterly instalments, the interest being first paid and balance of said net receipts then to be applied upon the principal, which instalments should amount to such sum of money as should be equal to the quarterly net receipts of earnings on $5000 of the capital stock of the company; it was further expressed in the note that it was given for the purchase-money of $5000 of the capital stock of the company, sold and transferred to Nelson by Pepper; and that if Nelson failed to pay any of the instalments quarterly, as aforesaid, after the receipt by the company of said net earnings, then the full sum of $5000, with interest, less interest and instalments paid, should become due and payable.

To secure the payment of this note Nelson, on the same day, executed to Pepper a paper, in the ordinary form of a mortgage, conveying to Pepper, his heirs and assigns, the following real and personal property, viz., "so much of Nelson's individual interest, right, title, and estate in the property and premises of and belonging to the Memphis Gaslight Company as should be represented by and equal to the $5000 of capital stock of said company at par," then

describing the real and personal property which the company owned, being gas works and other property in Memphis, and concluding with the usual condition, to be void on the payment of the note according to the tenor and effect thereof. This instrument was duly acknowledged and recorded in the registry of mortgages for Shelby County. On the 20th day of July, 1861, Pepper sold and transferred to Nelson one hundred and fifty-four additional shares of said company, at the par value of $15,400, and received a similar note and instrument for the consideration thereof. It appeared from the evidence in the case that Pepper sold this stock to Nelson and the remainder of Dean's stock to other persons, when he did, under apprehension that it would be confiscated by the Confederate authorities, as was threatened to be done, and from a desire to leave Memphis (which he soon afterwards did do, going north) for his own personal safety. But Nelson swore that he made the purchase of the stock in good faith, and that he received it without any trust or pledge for its return.

The war soon began to rage with severity, and all intercourse between the States in rebellion (including Tennessee) and the other States of the Union was not only interrupted, but was prohibited by President Lincoln's proclamation of August 16th, 1861, made in pursuance of the act of Congress of the 13th of July previous.

Nelson continued to reside at Memphis, within the Confederate lines, and received the regular quarterly dividends on the two hundred and four shares of stock, but did not and could not make any payment to Pepper or to Dean, to whom Pepper assigned the notes and mortgages, they both being within the Union lines. The amount of dividends thus received by Nelson was $3672.

On the 1st of June, 1862, Nelson transferred one hundred and ninety-four shares of the stock to Miriam Nelson, his wife, having previously transferred ten shares to a certain Benjamin May. Both transfers were without consideration, except that the object of the transfer to May was to make him a director, and the professed object of the transfer to

Nelson's wife was to make her a separate provision for maintenance.

On the 6th of June, 1862, the Federal forces entered the city of Memphis, and held military possession of that part of Tennessee until the close of the war. Dean visited Memphis during the summer and autumn of 1862, and saw Nelson there, who failed to make any payment on the notes. Nelson swore in the proceeding below, that Dean refused to receive any payment, alleging that the stock was absolutely forfeited by the failure to pay. Dean swore that he asked Nelson what he proposed to do about the payment of the net earnings which he had received, and that Nelson answered that he was not disposed to pay it, because he might have to pay it again to the Confederate government. From the evidence in the case this court expressed itself as inclined to believe that this ground was assumed by Nelson, and that he did not make an unequivocal tender of the money due, and whilst it admitted that it was probably true that Dean insisted that the stock was forfeited, it was not satisfied that his conduct was such as to obviate the necessity of a tender by Nelson if the latter wished to prevent the principal from becoming due. At this time Nelson was allowed to remain peaceably within the Union lines, and there was no reason why he should not have paid the money to Dean.

On the 5th of April, 1863, Nelson, with his family, was ordered to remove south of the lines of the United States forces, and not to return. This order was made in retaliation for some outrages committed by guerillas in the vicinity. In pursuance of it Nelson and his family removed within the Confederate lines, and remained therein during the remainder of the war; and were not permitted to re-enter Memphis, although Nelson, at one time, requested permission to do so. The other complainant, May, was within the Confederate lines during the entire contest.

On the 25th of April, 1863, General Veatch, then commanding the military district of Memphis, by a special order, established and organized a court or civil commission for

the hearing and determination of all complaints and suits instituted by loyal citizens for the collection of debts, enforcement of contracts, prevention of frauds, recovery of the possession of property, and generally to do whatever can be done by a court deriving its powers from military authority. Before this court or civil commission, on the 1st day of September, 1863, Dean filed a petition setting forth the fact of the sale of the stock to Nelson, that Nelson had given a note, and to secure the payment of said note had executed and delivered *mortgages* on all the interest of said Nelson in said company, represented by said stock, which *mortgages* were recorded, &c.; and praying for the foreclosure of the "*said mortgages*," and sale of the two hundred and four shares of stock, in order to raise the amount due on the notes. Nelson and wife, and May, were made defendants, but were returned "*Not found;*" and publication of notice to them to appear was made in accordance with the laws of Tennessee existing prior to the rebellion. No appearance being effected, a decree was made, execution issued, and the stock was sold by the marshal on the 23d day of October, 1863, to one Hanlin, and was subsequently transferred to him on the books of the company by the secretary, pursuant to an order of the civil commission. Hanlin immediately transferred the stock to Dean. From that time till June, 1865, Dean drew the dividends on the stock.

In the month just named, Nelson, his wife, and May, filed a bill in the court below, praying, in substance, that the stock might be decreed to belong to them, and that Dean might account for all the dividends received by him, to be applied to the payment of the notes, &c., and for general relief.

Dean, in his answer, set up and insisted upon two grounds of defence:

First, the forfeiture of the condition of the mortgage, which, under the circumstances of the case, and from the unconscionable nature of the transaction, he insisted should be held to be an absolute forfeiture, without benefit of redemption; in other words, that the instrument should be

regarded as a conditional assignment or transfer, and not as a mortgage.

Secondly, he set up the proceedings before the civil commission, by which, as he contended, even if the instrument were a mortgage, all equity of redemption in the stock was foreclosed. The defendants, Nelson, his wife, and May, on the contrary, insisted that the paper was a mere mortgage; that the condition in the notes making the principal due if the instalments were not regularly paid, was in the nature of a penalty, and should not have been enforced in an equitable proceeding; that the court or civil commission was illegal and without authority; that it never had any jurisdiction of the person of the appellants, nor of the property attempted to be foreclosed; that the existence of the war, and the residence of the appellees within the Confederate lines, forbade any legal proceedings against them or their property; that, therefore, they had been illegally dispossessed of the latter, and were entitled to have it restored to them without conditions; and, finally, that Dean was accountable to them for the dividends received by him, to be credited on the notes.

The court below decreed that Dean should transfer to Mrs. Nelson, for her sole and separate use, one hundred and ninety-four shares of the stock, and to May ten shares, so as to restore the stock to them respectively, as they had it prior to the decree of the civil commission divesting it out of them. And that a master should take and state—

An account of what amount of dividends had been declared and paid on the said two hundred and four shares since the sale to Nelson by Pepper, and when, how, and to whom they were paid:

And an account between Nelson and Dean, as assignee of Pepper, which should show the amount of principal and interest of the notes executed by Nelson to Pepper, for the two hundred and four shares, with all amounts of dividends and profits received on them by Dean, applied as credits according to the laws of Tennessee, as to the application of partial payments, and showing what balance, if any, was now

due upon the said obligations, or what balance, if any, was due from Dean, after paying the said obligations in full.

From this decree Dean took an appeal here.

*Mr. Holman, for the appellant:*

The assignments of stock by Pepper to Nelson were made without any consideration whatever. There was no mutuality in the contracts. They imposed no obligation on Nelson. His agreement to pay for the stock out of his own net earnings was not a valuable consideration for its assignment to him. Pepper acted under what was, practically, duress; under an influence which disturbed his judgment, and deprived him of the capacity to act calmly; and this condition of mind was brought about by the prospect of a rebellion; by the acts of traitors, with whom Nelson was doubtless himself in concert. Is *he* to profit by a profitable contract obtained by him at such a moment? Certainly, if this contract were executory, equity could not, under the decision in this court of *Dorsey* v. *Packwood*,[*] enforce it. But Dean, without fraud on his part, has, through the decree of the military court, got the legal title to the stock in his hands, and the other side come in to ask the aid of equity. In such a case the court will consider the original contract, its fairness, and the consideration on which it was founded, in determining whether the party asking relief is in equity entitled to it, and the court will refuse its aid, as in case of a bill for specific performance, if the original contract, if executory, ought not to have been enforced.

These instruments were not mortgages, but were absolute conveyances of the stock with defeasance, to be null and void if the conditions were performed, but to be absolute upon default. The condition of paying over dividends received has been broken. The conveyances, therefore, have become absolute, and all of Nelson's title has been divested, and vested in Pepper, and in Dean, his assignee, even without reference to the decree of the civil commission. Cer-

---

[*] 12 Howard, 126.

tainly, in view of the unconscionable character of the bargain on Nelson's part, this is the light in which the court must consider the instruments.

We assume, of course, that whatever the instruments were, they operated on shares of stock. Nelson, indeed, had nothing else on which they could operate.

If prior to June 6th, 1862, Nelson could pretend to be excused from paying the dividends he had received by reason of the hostile military power, which he had himself doubtless contributed to organize, between the city of Memphis and Cincinnati, the domicile of Dean, no such excuse could avail after the 6th of June, 1862, when the Federal forces took possession of Memphis, or when he met Dean in Memphis, in the autumn of that year. And, considered as contracts, time was clearly of their essence.

Even if the instalments are to be regarded as mortgages, still upon the failure of Nelson to fulfil his contracts, if he possessed any right or interest in this stock, it was only a right in equity to redeem; and a court of equity will not aid a party to redeem, and relieve him from the consequence of his default, when he seeks thereby to obtain the benefit of an unconscionable contract, which, if executory, a court of equity would not enforce.

But a right of redemption arises, in any case, but from the payment or tender of payment of the debt. Here Nelson and May, still retaining the $3672 of dividends received on this stock, without payment or tender to Dean of that sum, or of any portion of the debts, both long since due by the terms of the contracts, seek by their bill to be reinvested with the title to the stock. The claim set up is against equity and good conscience.

But, independently of this, the decree of the civil commission affords a judicial bar to this bill. That a military commander, in a conquered district, in which the civil authority is overthrown or suspended, may, to aid him in the protection of private rights and to preserve civil order, establish agencies of civil government, and among them courts of justice, is scarcely open to discussion. The humane prin-

ciples of modern international law not only recognize this power in a military commander, but would seem to demand its exercise, thus ameliorating as far as may be the severities of military law.   The duty of the Federal government to protect the rights of all of its loyal citizens rendered the application of those enlightened principles of international law to the districts of country under military occupation in the late war imperative.   General Veatch, commanding the military district of Memphis, a commercial city of sixty thousand people, with intimate commercial relations with many of the loyal States of the Union, was not only authorized, but was bound to establish in that city, while held by force of arms, such a tribunal.   The validity of the proceedings of such tribunals, established by military power, seems to be sustained by many decisions in the courts of this country.*

*Mr. P. Phillips, contra; a brief of Messrs. Kortrecht and Craft being also filed:*

1. Even if this were a bill for the specific performance of an executory contract it would be maintained; for it is not necessary that a consideration should be adequate, but only that it be valuable.   The parties themselves are the best judges of the adequacy, and, therefore, inadequacy will not be an answer in equity to the prayer for specific performance, if not so gross as to prove fraud or imposition.   But we here stand on an *executed contract,* and ask relief only to enforce the rights which pertain to *it.*   The distinction between the two classes of cases is elementary.†   Where in such a contract there is neither fraud, accident, nor mistake, however absurd the stipulations, the contract will be enforced.   In those cases where the inequality of the bargain

---

* Jecker *v.* Montgomery, 18 Howard, 116; Cross *v.* Harrison, 16 Id. 164; Leitensdorfer *v.* Webb, 20 Id. 176; Hefferman *v.* Porter (Supreme Court of Tennessee), American Law Register for January, 1870, 41; Rutledge *v.* Fogg, 3 Coldwell, 554; The Grapeshot, 9 Wallace, 129.

† Ellison *v.* Ellison, 6 Vesey, 662; Pulvertoft *v.* Pulvertoft, 18 Id. 99; Bunn *v.* Winthrop, 1 Johnson's Chancery, 337.

is so gross that the mind cannot resist the inference of fraud, the court interposes, not on the ground of the inequality; but because from its grossness there arises the most vehement presumption of fraud.* The inadequacy complained of in this case is, that the payments were to be made only out of the dividends received from the stock; but as these dividends were regarded as *certain to be made*, they were merely taken as the measure of the payments.

The contract in this case is no doubt an unusual one; but the condition of the country when it was made, and by which it was suggested, was unusual; far more unusual than a contract of such a nature itself.

It is again objected that the complainant is not entitled to relief, because the sale of the stock was made under circumstances which constituted duress. Admit that these sales would not have been made if the country had been at peace. What has that to do with the result? When it was supposed, as for a short time during the rebellion it was by some, that Washington would be captured by the rebels, the stress of that belief forced sales of property at great sacrifices. The contingencies of the war operated in determining the judgment and action of men; but such considerations, in the absence of fraud or imposition, have not heretofore been considered as sufficient to avoid a contract for duress. We do not deal with the question of "free will" as one of metaphysics. All that the law requires is the exercise of a sane mind, with liberty of action. That Pepper and Dean were of sound mind and discretion is admitted. They speculated as to the *chances of war*. If they had firmly believed in the defeat of the rebel cause, the sale would not have been made. That it was made, is but an evidence they did not so believe.

The force which deprives the party of his free will must have a *direct relation to, and connection with the contract which is sought to be avoided.* Violence, and the rule of a mob, or the action of the elements, may create such apprehension

---

* Dunn *v.* Chambers, 4 Barbour, S. C., 379; Eyre *v.* Potter, 15 Howard, 60.

for the safety of property as to induce its sale for an inade-
quate consideration. But however strong the apprehension,
and however it may sway the mind, the will is still left free,
what to choose, and what to do. The owner may retain his
property, and take the hazard of its destruction, or he may
dispose of his title to others who have more confidence in
its safety. If his judgment, influenced by fraud or impo-
sition, induces him to select the latter course, this is the ex-
ercise of free will. He cannot in legal parlance assert that
he was forced to enter into the contract. If Pepper had
made the sale in Cincinnati, and to one of its citizens, with
what pretext could he have maintained the right to annul it?
How would such a sale differ from the sale made in Mem-
phis in execution of the determination arrived at in Cincin-
nati? If the apprehension that confiscation laws might be
passed induced the sale, this is not a duress which author-
izes a repudiation of the contract, when the danger had
ceased to exist.

2. If the instruments which we call mortgages were, as it
is contended on the other side they were, conditional sales,
still they are conveyances only of Nelson's interest in the
property of the Gaslight Company, and *stock* would not
pass under them. But we submit that this theory is too far
at variance with the whole history of the transaction, and
with Dean's statements made in the petition filed in the
civil commission, to be now considered. As a question of
law, however, this transaction has none of the elements of
conditional sales.* If they had been conveyances of stock,
only the equitable title would have passed, because the legal
title could not be transferred except upon the stock books of
the company. The legal principles as to conditional sales,
sought to be relied upon, have application only to *legal titles*.

3. The decisions cited on the other side in support of the
lawfulness of the civil commission, fail to show that a mili-
tary commander of a city in easy communication, as it is
matter of public history that Memphis then was, with the

---

* Hickman *v.* Cantrell, 9 Yerger, 172.

capital, may without any authority from Congress or the President establish courts of justice. If not confined to the commander-in-chief, then it must exist in every officer in command of a particular place, even though the command may not extend beyond a corporal's guard.

4. But if it were a lawful court, of what value was its decree of divestment in this special case? The same military power which sent Nelson beyond the Federal and into the rebel lines, with a prohibition against return, a few months thereafter, renders a decree *pro confesso* against him, because he did not respond to an advertisement directing his appearance, and because though *called* to come into court, he made no answer. Such a decree cannot be maintained except we adopt the fiat of arbitrary power " *sic volo, sic jubeo.*" Then, indeed, no advertisement and no proclamation are necessary. But tested by the principles of universal justice, it is a mere nullity. The law of nations, the acts of Congress, nay, the direct command of this military power itself, *forbade* Nelson from appearing, even if accident had brought the publication to his notice. The law cannot create a default when the law forbids a performance. In England, in Sir Alexander Don's case,* in the House of Lords, a decree was reversed which permitted a judgment against Don recovered in France without personal service, during the war, to be given in evidence to avoid the plea of prescription in a suit brought against Don in Scotland after the war; Don, at the institution of the proceedings, being a subject of Great Britain, resident therein.

In the northern part of our own country (Illinois),† a decree of foreclosure, founded on such an advertisement as the one here, was set aside, though the statutory period of redemption had passed. The court considering that "titles thus acquired would rest on the basis of robbery, not upon a judicial divestiture of the debtor's interest recognized as just '*jure gentium.*'" And the same doctrine is held in the south-

---

* 5 Clark & Finelly, 21.

† Connecticut Insurance Company *v.* Hall, 16 American Law Register, 606.

ern part (Georgia), in a case where the jurisdiction was exercised within Confederate lines against a defendant being at the time in one of the loyal States.*

Mr. Justice BRADLEY, having stated the case, delivered the opinion of the court.

In determining the questions raised by this record, the court is of opinion in the first place, that Dean must be regarded as concluded on the question of the sale of his stock. Had the transaction been merely an agreement for a sale upon the terms on which the sale was actually made, and this a bill by the vendees for a specific performance, we should find great difficulty in distinguishing this case from that of *Dorsey* v. *Packwood.*† But here the sale was actually made, and the stock was actually transferred to Nelson, so that, in the absence of fraud, it became absolutely his. And in support of the *bona fides* of the transaction, it may be said that in view of all the contingencies of the situation, the arrangement was at the time an advantageous one for Dean. At all events, he chose, on the whole, to acquiesce in it, and in his bill to foreclose the stock, presented before the civil commission, he makes no claim but that of holder of the mortgage, affirming and claiming under Nelson's title throughout. And in his answer to the present bill he nowhere hints that Nelson was guilty of any bad faith in the transaction, or made any agreement to hold the stock for him, or in any other way than as a *bona fide* purchaser thereof. And it is hardly correct to say that Nelson incurred no obligation in the transaction. He agreed to pay the whole amount immediately in case of failure to pay any instalment after the receipt *by the company* of the net quarterly earnings. And this condition was not in the nature of a penalty, as surmised by the appellees; but was of the substance of the contract. So that, on failure to pay or tender the money received by him, or by the company, on account of the stock

---

* Cuyler *v.* Ferrill, 8 American Law Register, New Series, 100.

† 12 Howard, 126.

purchased, the whole debt became due and payable as a personal obligation of Nelson.

But, at all events, the stock was actually sold and transferred, and became the property of Nelson, and was possessed by him. The contract was an executed contract, and that transaction cannot now be impeached.

The next question relates to the character of the instrument given by Nelson to Pepper as security for the payment of his notes. Was it a conditional sale, or was it a mortgage? On this question hardly a doubt can be raised. The court is asked by the appellant, under the circumstances of the case, which the appellant asserts to have been unconscionable on Nelson's part, to *consider* the instrument as a conditional conveyance of the stock, and not a mortgage. But the court has no power over the transaction to make it other than, or different from, what the parties themselves made it. If it is a mortgage, it is the duty of the court to declare it a mortgage; and if it is a mortgage it has, perforce, all the incidents and privileges of a mortgage; and that it *is* a mortgage there is no room for question. The principal engagement is contained in the note, which creates a debt as soon as earnings or dividends are received. The other instrument is secondary, and is intended as security for the payment of the note. The appellee himself, in his proceedings before the civil commission, treats his claim as a debt, and the instrument of security as a mortgage. He calls it a mortgage; and the doctrine of " once a mortgage, always a mortgage," applies to it.

Then, being a mortgage, whether of real or personal property, the mortgagor has an equity of redemption, unless it has been extinguished in some legal way. The great question of the cause is, whether the equity of redemption has been extinguished.

It is unnecessary to decide whether the mortgage was one of real or of personal estate, or whether it was a legal or only an equitable mortgage. As no attempt has been made to cut off the equity of redemption, in any other manner than by legal proceedings, the question is reduced to the

simple one, whether those legal proceedings are valid and effectual for the purpose.

It is objected that the court or civil commission was not legally established; but it is not necessary to determine that question, as the proceedings themselves were fatally defective. The defendants in the proceedings (the appellees here) were within the Confederate lines at the time, and it was unlawful for them to cross those lines. Two of them had been expelled the Union lines by military authority, and were not permitted to return. The other, Benjamin May, had never left the Confederate lines. A notice directed to them and published in a newspaper was a mere idle form. They could not lawfully see nor obey it. As to them, the proceedings were wholly void and inoperative.

This leaves the equity of redemption in the mortgaged property unextinguished; and it is, therefore, the right of the appellees to redeem it.

In the opinion of the court, the whole principal and interest of the notes have become due and payable, and a redemption and retransfer of the stock should be decreed only on condition of the payment of principal and interest in full, after giving to the appellees credit for the sums received by the appellant; legal interest on each side to be allowed.

The decree of the Circuit Court, therefore, will be so far modified that, instead of requiring the appellant to forthwith transfer the stock, as directed in the decree, he be decreed to transfer it to the defendants, Miriam W. Nelson and Benjamin May, respectively, as therein directed, upon payment by the appellees to the appellant of the amount which shall be found to be due to him on the said two notes, after taking and stating the account in the said decree afterwards directed; neither party to recover costs of the other in this appeal.

DECREE MODIFIED ACCORDINGLY.