## BURBANK *v.* CONRAD.

1. In Louisiana, a conveyance of lands is valid between the parties without registration, and passes the title. The only consequence of a failure of the purchaser to place his conveyance on the records of the parish where the lands are situated is that he is thereby subjected to the risk of losing them if they be again sold or hypothecated by his vendor to an innocent third party, or if they be seized and sold by a creditor of his vendor for the latter's debts.

2. The Registry Act was not intended to protect the United States in the exercise of its power of confiscation from the consequences of previous unrecorded sales by the alleged offender. By the decree, the United States acquires for his life only the estate which at the time of the seizure he actually possessed, not what he may have appeared from the public records to possess, by reason of the omission of his vendees to record the act of sale to them; and only that estate, whatever it may be, for that period passes by the marshal's sale and deed.

ERROR to the Supreme Court of the State of Louisiana.

This was a suit for partition of certain real property in New Orleans, and was brought in a district court of Louisiana. The defendants had judgment, which was affirmed by the Supreme Court of the State, and the plaintiff brought the case here on writ of error. The facts sufficiently appear in the opinion of the court.

*Mr. Thomas J. Durant* and *Mr. J. Q. A. Fellows,* for the plaintiff in error.

*Mr. L. L. Conrad, contra.*

MR. JUSTICE FIELD delivered the opinion of the court.

This is a suit for a partition of certain real property situated in the city of New Orleans in the State of Louisiana. The plaintiff alleges that he is the owner of an undivided half of the premises; that the defendants are the owners of the other undivided half; and that from the nature of the property it cannot be conveniently divided in kind. He therefore asks a partition by licitation; that is, by a sale of the premises and a division of the proceeds.

The plaintiff asserts title to an undivided half by a deed of the marshal of the United States, executed to him upon a sale under a decree of the District Court, condemning and forfeiting

the property to the United States, in proceedings taken against it as the property of Charles M. Conrad, under the Confiscation Act of July 17, 1862.

The defendants assert title to the whole property by a sale by public act, made to them by their father, the said Charles M. Conrad, before the recorder and *ex-officio* notary-public of the parish of St. Mary, in Louisiana, on the 3d of June, 1862. This parish was then within the Confederate lines; and the Conrads, father and sons, were engaged in the rebellion against the United States. The act of sale was not placed on record in the city of New Orleans until 1870. The good faith of the parties in the transaction is not questioned, nor is the sufficiency of the consideration. But it is contended that the parties, being public enemies in hostile territory, were incompetent at the time to transfer or to accept the title to real property situated within the Federal lines. And if this position should not be sustained, it is further contended that the act of sale not having been recorded in the city of New Orleans until after the condemnation of the property by the District Court and its sale by the marshal, the plaintiff, as purchaser, took the title unaffected by the transaction; in other words, that his position is that of a third party buying upon the faith of the title standing in the name of the elder Conrad upon the public records.

We have recently had occasion, in *Conrad* v. *Waples* (*supra*, p. 279), to consider the first of these questions, and it will be unnecessary here to do more than refer to our opinion in that case. And the second question requires only a brief notice. The object of requiring a public record of instruments affecting the title to real property is to protect third parties dealing with the vendor, by imparting notice to them of any previous sale or hypothecation of the property, and to protect the purchaser against any subsequent attempted disposition of it. In Louisiana, the conveyance is valid between the parties without registration, and passes the title. The only consequence of a failure of the purchaser to place his conveyance on the records of the parish where the property is situated is that he is thereby subjected to the risk of losing the property if it be again sold or hypothecated by his vendor to an innocent third party, or if it be seized and sold by a creditor of his vendor for the latter's

debts.   The second purchaser from the vendor and the bidder at the judicial sale would, in that case, hold the property.   The United States never stood in the position of a second purchaser of the property sold by the elder Conrad.   They were not purchasers at any sale of his property.   They had caused his estate in the land, whatever that was, to be seized and condemned. By the decree of condemnation, that estate vested in them for the period of his life.   His estate for that period was then their property.   The statute declares that the property condemned "shall become the property of the United States, and may be disposed of as the court shall decree."   It was the property of the United States, therefore, which was sold and conveyed at the marshal's sale.   The United States acquired by the decree, for the life of the offender, only the estate which at the time of the seizure he actually possessed; not what he may have appeared from the public records to possess, by reason of the omission of his vendees to record the act of sale to them: and that estate, whatever it was, for that period passed by the marshal's sale and deed; nothing more and nothing less.   The Registry Act was not intended to protect the United States in the exercise of their power of confiscation from the consequences of previous unrecorded sales of the alleged offender.   It was in the power of Congress to provide for the confiscation of the entire property, as being within the enemy's country, without limiting it to the estate remaining in the offender; but, not having done so, the court cannot enlarge the operation of the stringent provisions of the statute.   The plaintiff had notice of the character and legal effect of the decree of condemnation when he purchased, and is therefore presumed to have known that if the alleged offender possessed no estate in the premises at the time of their seizure, nothing passed to the United States by the decree, or to him by his purchase.

We see no error in the ruling of the Supreme Court of the State of Louisiana, and its judgment is

*Affirmed.*

MR. JUSTICE CLIFFORD dissenting.

Power was conferred upon the President, and it was made his duty by the fifth section of the act to suppress insurrection,

to cause the seizure of all estate and property of the persons designated in that section, and to apply and use the same and the proceeds thereof for the support of the army. Proceedings *in rem* were authorized for the condemnation of such estates and property, the provision being that the proceedings should conform as nearly as may be to proceedings in admiralty or revenue cases, and that if the property is found to belong to a person engaged in rebellion, or who has given aid and comfort thereto, the same shall be condemned as enemies' property, and shall become the property of the United States. 12 Stat. 589.

Pursuant to that act, an information in proper form was filed against the several properties in controversy in these cases; and the record shows that the same were formally condemned as forfeited to the United States, as appears by the decree of the District Court, fully set forth in the transcript. Due condemnation of the several properties having been adjudged, the writ of *venditioni exponas* was issued.; and the same were sold, the defendant in the first suit and the plaintiff in the second being the purchasers of the parcels, the respective titles of which are in controversy in these suits. Formal conveyances were made to the respective purchasers, they respectively being the highest bidders for the several parcels described in their respective deeds of conveyance.

Certain parcels of the property sold as aforesaid are embraced in *Conrad* v. *Waples*, which was commenced in the Circuit Court by the present plaintiff against the purchaser under the marshal's sale, and certain other parcels of the property are embraced in the second suit, which was commenced in the State court by the grantee of those parcels under the marshal's deed, against the defendant in error in that case.

Service was made in that case; and the defendant appeared and set up the seizure of the several parcels as the property of Charles M. Conrad, and the condemnation and sale of the same as previously explained, and the conveyance of the said parcels to him, the defendant, by the marshal as the property of the United States. Interlocutory proceedings of various kinds followed, which it is not important to notice. All such matters having been adjusted, the parties went to trial, and the verdict and judgment were in favor of the defendant. Exceptions were

taken by the plaintiff; and he sued out a writ of error, and removed the cause into this court.

Fee-simple title to the premises is claimed by the plaintiff by virtue of a conveyance from his father, Charles M. Conrad, to himself and his brother, called in the jurisprudence of that State an act of sale, which was executed on the 6th of May, 1862, during the rebellion, before Joseph L. Nettles, recorder in and for the parish of St. Helena, which at the time was within the Confederate lines, the estate and property conveyed being situated in New Orleans, which at the time was in the possession of the army of the United States.

During the trial, the plaintiff offered that act of sale in evidence, in support of his title to the premises in controversy; and the defendant objected to the introduction of the same, upon six grounds: 1. That the act was not a sale, but a mere giving in payment, and that no delivery of the property was or could be made, inasmuch as the same was situated within the Federal lines, and that the act was executed within the military lines of the Confederate States, where the parties thereto were sojourning. 2. That it being admitted that the vendor and vendees had been before and were, at the date of the act and afterwards, engaged in rebellion against the United States, and so continued until the end of the war, and that the act was passed within the Confederate lines, the property being situated within the Federal lines, the act of transfer was inoperative and void. 3. That such evidence would tend to contradict the decree of condemnation previously entered in the District Court, and set up by the defendant in his answer. 4. That it being admitted that the grantor and grantees were enemies of the United States at the time the act was passed, the grantor was incompetent to complete the transfer of the property, the same being within Federal military lines. 5. That the copy of the act offered in evidence was not, by the statute of the State, admissible in evidence against any right set up by a third person, without being accompanied with proof that the same had been duly and legally registered in the proper office where the properties were situated. 6. That a state of war then existing, a deed executed in the parish of St. Helena, within the Confederate lines, could not be legally recorded in

the parish of Orleans, which at that date was within Federal military lines.

These several objections to the evidence offered were sustained by the court, and the plaintiff excepted, which presents the principal question in the case.

Primarily, *Burbank* v. *Conrad* was a petition in the Fifth District Court of the city for partition, the present plaintiff, as petitioner, claiming one undivided half part of the premises under the aforesaid confiscation proceedings and sale. Process was served; and the defendants appeared and pleaded that the sale under those proceedings was void, the supposed owner of the premises having had, at the filing of the information, no right, title, or interest in the property. Instead of that, that they were the true and sole owners of the same, by virtue of a notarial act of sale executed by their father, June 3, 1862, before J. G. Parkinson, recorder of the parish of St. Mary, which presents the same question as that involved in the other case, it appearing that the place where the act of sale was executed was within the Confederate lines.

Hearing was had, and the court rendered judgment in favor of the petitioner. Prompt appeal was taken by the defendants to the Supreme Court of the State, where the parties were again heard, and the Supreme Court reversed the decree of the Fifth District Court, and rendered judgment in favor of the defendants, that they have a valid title to the property described in the petition. Judgment having been entered in favor of the defendants, the plaintiff sued out a writ of error, and removed the cause into this court.

Errors assigned by the plaintiff are; that the Supreme Court of the State erred in reversing the decree of the Fifth District Court, and in entering a decree in favor of the defendants that they had a valid title, and that they be put in possession of the premises.

Sufficient appears to show that the parties in each case claim title to a certain portion of the estate and property condemned as forfeited to the United States under the before-described confiscation proceedings. Two of the claimants, to wit, the defendant in the first suit and the plaintiff in the second, set up title as purchasers under the respective deeds of the

marshal given to them respectively as purchasers at the confiscation sale. On the other hand, the plaintiff in the first suit and the defendants in the second claim title as grantees of their father, the respective conveyances bearing date during the rebellion, but before the passage of the confiscation act under which the several properties were condemned as forfeited to the United States for the treasonable acts of the father.

Conveyances of the kind appear in the record, the one to the plaintiff in the first suit having been executed May 6, 1862, in the parish of St. Helena, before the recorder of that parish, within the Confederate lines, the plaintiff alleging that the same was duly recorded May 31, 1862, and the defendant denying the allegation in his answer; and the other having been executed to the defendants in the second suit, June 3, 1862, in the parish of St. Mary's, before the recorder of that parish, which was also within the Confederate lines; nor was the conveyance ever recorded until the 8th of December, 1870, in the parish of Orleans, where the property is situated.

Argument to show that the proceedings to confiscate the properties in controversy were correct in form is scarcely necessary, as no attempt is made to impeach their formality. Seizure of the properties in controversy was duly made under the act of Congress referred to; and the information charged that the owner of the properties seized, subsequently to the passage of the act, did act as a member of the Confederate Congress, and that he was engaged in armed rebellion against the United States, and that by reason of the premises the properties described in the information, and all the right, title, interest, and estate of the owner, became and were forfeited to the United States, and ought to be condemned to their use.

Due monition issued and was served, which is notice to all the world; and no appearance having been entered, the information or libel was taken as confessed. Proofs were taken which fully established the charges; and the court entered a final decree to that effect, and that the several properties be, and the same are, hereby condemned as forfeited to the United States.

Sales were subsequently made under a *venditioni exponas* issued in due form; and the defendant in the first case and the

plaintiff in the second case became the purchasers of the respective properties in controversy in these two suits.

Beyond all doubt, the title of the defendant in the first and the plaintiff in the second is perfect and must prevail, unless the claim set up by the plaintiff in the first suit and that set up by the defendants in the second can be sustained, both of which depend substantially upon the same state of facts.

Legal seizure of the property condemned was made on the 29th of July, 1863, and the record shows that the information was filed on the 7th of August following. Judgment was rendered Feb. 3, 1865, and the sale followed under the writ of *venditioni exponas* in the regular course of proceedings in such a prosecution.

Jurists of all schools and courts of all nations agree that the title to real estate is governed by the law of the place where it is situated. Differences of opinion upon the subject existed at one time; but the confusion which arose from the application of inconsistent systems of law to such titles ultimately led courts and jurists to narrow the law in all suits concerning immovable property to that of the forum *rei sitæ.* Whart. Confl. Laws, sect. 273; *United States* v. *Crosby,* 7 Cranch, 115.

No estate of freehold in land can be conveyed in Massachusetts, unless it be by a deed or conveyance under the hand and seal of the party; and, to perfect the title as against strangers, it is further requisite that the deed should be acknowledged before a proper magistrate, and be recorded in the registry of deeds for the county where the land lies. *Clark* v. *Graham,* 6 Wheat. 577; *Kerr* v. *Moon,* 9 id. 565.

Authorities to that effect are too numerous for citation; nor is it necessary to extend the list, as the principle is now universally acknowledged. Suffice it to say, in the language of Judge Story, that the title to real property can only be acquired, passed, or lost, according to the *lex rei sitæ;* for which proposition he refers to the expressive language of Sir William Grant, that the validity of every disposition of real estate must depend upon the law of the country in which that real estate is situated. *Curtis* v. *Hutton,* 14 Ves. 541; Story, Confl. Laws (6th ed.), sect. 424.

Courts and jurists everywhere also agree that all trading in

time of war with a public enemy, unless by permission of the sovereign, is interdicted when war is declared or duly recognized by the belligerent parties. *The Hoop*, 1 C. Rob. 196; *Exposito v. Bowden*, 7 Ell. & Bl. 779; *Griswold* v. *Waddington*, 15 Johns. (N. Y.) 57; 3 Phill. Int. Law, 108; *White* v. *Burnley*, 20 How. 235.

As soon as war is commenced, all trading, negotiation, communication, or intercourse between the citizens of the belligerent countries must cease, without direct permission of the sovereign power. 1 Chitty, Comm. Law, 379; 1 Duer, Ins. 419; *United States* v. *Grossmayer*, 9 Wall. 72.

Six classes of persons are included in the fifth section of the act, which makes it the duty of the President to cause the seizure of all their estate and property, and to apply and use the same, and the proceeds thereof, for the support of the army.

Due seizure is admitted; but the better opinion is, that it was not intended that the mere act of seizure should vest the property so seized in the United States, as the seventh section provides that, to secure the condemnation and sale of any such property after the same is seized, proceedings *in rem* shall be instituted in the District Court; and that if it shall be found that the property belonged to a person engaged in rebellion, or who had given aid or comfort thereto, the same shall be condemned as enemies' property, and become the property of the United States, and may be disposed of as the court shall decree. *Bigelow* v. *Forrest*, 9 Wall. 350.

Cases arise, undoubtedly, where the property in such a case is divested out of the owner, and vested in the sovereign, immediately on the commission of the offence; as, where the words of the statute are, that if a certain offence be committed the forfeiture shall take place; or that if the described offence is committed the property shall be forfeited. *United States* v. *1960 Bags of Coffee*, 8 Cranch, 398; *United States* v. *The Brigantine Mars*, 8 id. 416; *The Annandale*, Law Rep. 2 P. & D. 218; *The Reindeer*, 2 Cliff. 68; *Robert* v. *Witherhead*, 12 Mod. 92; *Wilkins* v. *Despard*, 5 T. R. 112; *Certain Logs of Mahogany*, 2 Sumn. 589; *Henderson's Distilled Spirits*, 14 Wall. 44.

Unless the words of the statute are absolute, no such consequences follow until the property is condemned; as, where the

sovereign may by the terms of the same proceed against the property or the person who committed the wrongful act, it is held that the title does not vest in the sovereign until the property is condemned. *United States* v. *Grundy*, 3 Cranch, 338.

Judgment was rendered Feb. 3, 1865, in the confiscation proceedings; and from that time it must be admitted that the title to the several properties was vested in the United States, unless the title set up by the plaintiff in the first case and by the defendants in the second can be sustained.

Sect. 5 of the act of July 13, 1861, provided that the President, whenever the contingencies therein specified should occur in any State or States, or parts thereof, might, by proclamation, declare that the inhabitants of such State, section, or part thereof are in a state of insurrection, and that thereupon all commercial intercourse by and between the same and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful, so long as such condition of hostility shall continue. 12 Stat. 257.

Conformably to that authority, the President, on the 16th of August in the same year, issued his proclamation, in which he declared that the inhabitants of certain States, including the State of Louisiana, were in a state of insurrection against the United States, and that all commercial intercourse between the same and the inhabitants thereof, with certain exceptions not material to be noticed in this investigation, and the citizens of other States and other parts of the United States, is unlawful, and will remain unlawful until such insurrection shall cease or has been suppressed. Id. 1262.

Provision was also made by the fifth section of the said act of Congress that all goods and chattels, wares and merchandise, coming, after such proclamation, from such State or section into the other parts of the United States, and all proceeding to such State or section, by land or water, shall, together with the vessel or vehicle conveying the same, or conveying persons to or from such State or section, be forfeited. *The Reform*, 3 Wall. 617.

Public war, duly declared or recognized as such by the war-making power, imports a prohibition by the sovereign to the

subjects or citizens, of all commercial intercourse and corre-
spondence with citizens or persons domiciled in the enemy
country. *Jecker et al.* v. *Montgomery*, 18 How. 110; *The Rapid*,
8 Cranch, 155; *Potts* v. *Bell*, 8 T. R. 548; Maclachlan, Shipp.
473; Wheaton, Int. Law, by Lawrence, 547; *The William
Bagaley*, 5 Wall. 377.

Attempt was made, in argument, to distinguish the first case
from the second, upon the ground that the supposed notarial act
of sale óf the 6th of May, under which the plaintiff in the first
suit claims title, was, on the 31st of that month, registered in
the parish of Orleans, where the land is situated; but it will be
seen, by reference to the record, that the act of sale was made
subsequent to the secession of the State, and during the period
when the parish where the property is situated was temporarily
within the Confederate lines.

Enemy parties conveying or accepting conveyances of real
properties, under such circumstances, must be understood to do
so with the knowledge that the rightful sovereign, if he is suc-
cessful in regaining the sovereignty of the State or district, may
refuse to recognize the validity of such a transfer, in a case
where it appears that the grantor, before the act of transfer was
executed, had been guilty of treasonable acts against his rightful
sovereign, and that both grantor and grantees were at the time
engaged in war against the rightful government. *United States*
v. *Huckabee*, 16 Wall. 414.

Proof of a decisive character is exhibited in the record, that
the rule of the Confederate States over the parish where the
property is situated ceased on the 2d of May, 1862, when the
national army landed there and took possession of the parish.
*The Venice*, 2 Wall. 258; *The Ouachita Cotton*, 6 id. 521.

Military possession by the Confederates followed secession;
and the insurgents continued to hold the city from the date of
secession to the time when our army landed there, or a few
days before, when the mayor of the city declared that the city
was undefended, and at the mercy of the victors.

Both the vendor and vendees were engaged in open rebellion
against the United States at the time the notarial act of sale
was passed within the insurgent lines, the property at the time
being situated within the Federal lines; from which it follows

that the vendor was legally incompetent to make sale and delivery of the property to the vendees, and that the vendees were legally incompetent to accept sale and delivery from the rebel vendor. Actual delivery of the property could not lawfully be made, nor could the supposed act of sale be lawfully registered in the parish where the land is situated; the proclamation of the President providing that all commercial intercourse between the insurrectionary State and the inhabitants thereof with the citizens of other States and other parts of the United States is unlawful, and will remain unlawful until such insurrection shall cease, or has been suppressed. 12 Stat. 257, 1262.

Courts of justice, even with the consent of the opposite party, will not enforce a right or contract in violation of a statute, although not expressly declared void by the enactment. Powell, Contr. 166; Comyns, Contr. 59; *Bank* v. *Owens*, 2 Pet. 527; *Coppel* v. *Hall*, 7 Wall. 542.

In war, says Chancellor Kent, every individual of the one nation must acknowledge every individual of the other nation as his own enemy, because the enemy of his country. It reaches to intercourse, transfer or removal of property, to all negotiation and contracts, to all communication, to all locomotive intercourse, to a state of utter occlusion to any intercourse but one of open hostility, and to any meeting but in actual combat. *Griswold* v. *Waddington*, 16 Johns. (N. Y.) 438; *The Rapid*, 8 Cranch, 155.

All intercourse, says Story, between the subjects and citizens of the belligerent countries is illegal, unless sanctioned by the authority of the government, or in the exercise of the rights of humanity. *The Julia*, 8 Cranch, 181.

If a plaintiff cannot open his case without showing that he has broken the law, courts of justice will not assist him to recover, whatever the equities of his case may be. *Fowler* v. *Scully*, 72 Pa. St. 456.

Support to the opposite theory, it is supposed, may be derived from the case of *Kershaw* v. *Kelsey* (100 Mass. 561); but it is difficult to see what foundation there is for the supposition, if the decision is confined, as it should be, to the matters involved in the controversy. Take the facts as reported, and they are

as follows: That the defendant, a citizen of Massachusetts, being in Mississippi in February, 1864, took a lease for one year from the plaintiff, a citizen of Mississippi, of a cotton plantation situated in the latter State, for a rent of $10,000, half in cash and half to be paid out of the cotton crop; the lessor agreeing to deliver, and the lessee to receive and pay for, the value of the corn then on the plantation.

It did not appear whether the defendant went into that State before the war or after it began; nor was there any evidence of any intent on the part of either party to violate or evade the laws, or to oppose or injure the United States. Every presumption of that sort is negatived; but it appeared that the defendant paid the first instalment of rent, took possession of the premises, used the corn there, provided the plantation with supplies to the amount of $5,000, planted and sowed it, and, in the early spring, was driven away by rebel soldiers, and never but once afterwards returned to the plantation.

How long the defendant had resided there prior to the contract of lease did not appear; but the report states that the plaintiff continued to reside on the plantation, raised a crop of cotton there, and delivered it to the son of the defendant, by whom, in the autumn of the same year, it was forwarded to the defendant, who sold it and retained the profits, amounting to nearly $10,000.

Speaking of the facts, the court say, in effect, that the lease was made within the rebel territory, where both parties were at the time, and that it seems to contemplate that the lessee should continue to reside there throughout the term; that the rent was in part paid on the spot, and that the residue was to be paid out of the produce of the land; that the corn the value of which is sought to be recovered in the action was delivered and used on the plantation; that no agreement was made that the cotton crop should be transported, or the rent sent back, across the line between the belligerents; that no contract or communication appears to have been made across that line relating to the lease, to the delivery of possession of the premises, or of the corn, or the payment of the rent of the one or the value of the other.

These limitations, with one other which follows, should be

carefully observed, as they furnish the key to what the court subsequently decided. None of the facts as reported are of a character to require any modification of the laws of war as expounded by the great jurists, to whose decisions reference has already been made ; and the court in that case very justly remarked, that the fact that the cotton was subsequently forwarded by the son to the defendant, though it may have been unlawful, cannot affect the validity of the lease, as the lease does not contain any such stipulation.

Based upon the reported case, as thus very clearly explained, the court decided that the facts did not contravene the law of nations or the public acts of the government, even if the plantation was within the enemies' lines, and that the plaintiff upon the case reported is entitled to recover the unpaid rent and the value of the corn. Many other matters are doubtless the subject of remark in the opinion, but the propositions as stated embody every thing which the justices of the court decided in the case.

Their decision is plain, and they make two admissions, — one direct, and the other necessarily implied, — which are equally plain : 1. That the act of forwarding the cotton to the defendant was unlawful. 2. That if the lease had contained any agreement that the cotton crop should be transported or the rent sent back across the line between the belligerents, or if any contract or communication had been made across that line relating to the lease, the delivery of possession of the premises or of the corn, or the payment of the rent of the one or the value of the other, the agreement or contract would have been void, as contravening the law of nations and the public acts of the United States.

Viewed in the light of these suggestions and the authorities referred to, it is clear that the registration of the act of sale of the 6th of May was unlawful, and that the title in the first case cannot be distinguished from the title in the second case, where no registration was made in the parish where the land is situated, until Dec. 8, 1870, nearly six years subsequent to the date of the decree of condemnation. Nor does the registration in the first case give any more effect in law to the title in that case than belongs to the title in the second, as it pur-

ports to have been made May 31, 1862, nearly a month subse-. quent to the time when the army of the United States landed in the city of New Orleans, and put an end for ever to the temporary and unlawful occupation of that city by the military forces of the Confederate States.

Suppose that such a registry, if it had been made during the Confederate occupation, would have been valid as a transaction between Confederates within the Confederate lines, still it is clear that a notarial act of sale, executed before a Confederate notary within the Confederate lines, could not be lawfully recorded in the parish of New Orleans at any time after the army of the United States landed there and took permanent possession of the parish. Beyond all question, such a registration was unlawful and a nullity, as neither the grantor nor grantees could use the Federal mails to send the document there for registration, nor could they travel there for that purpose in person, or send an agent there to forward the same for registration. *Dean* v. *Nelson,* 10 Wall. 158; *Lasere* v. *Rochereau,* 17 id. 437; *Montgomery* v. *United States,* 15 id. 395.

One of the immediate and important consequences of the declaration of war is the absolute interruption and interdiction of all commercial correspondence, intercourse, and dealing between the subjects of the two countries. 1 Kent, Com. (12th ed.) 66. Nothing is better settled in legal decisions than the doctrine that war puts an end at once to all dealing and all communication of the citizens of one belligerent country with those of the other belligerent country, and that it places every individual of the respective governments, as well as the governments themselves, in a state of hostility. 1 Kent, Com. (12th ed.) 67; *Potts* v. *Bell,* 8 T. R. 548; *Woods* v. *Wilder,* 43 N. Y. 168.

Judicial decisions to that effect are very numerous; and the Supreme Court of Massachusetts admit that the law of nations, as judicially declared, prohibits all intercourse between citizens of the two belligerents inconsistent with the state of war, and that the rule in that regard prohibits every act of voluntary submission to the enemy, and every act or contract which tends to increase his resources, and every kind of trading or commercial intercourse, whether by transmission of money or goods, or

orders for the delivery of either, between the two countries, directly or indirectly, or through the intervention of third persons or partnerships. Lawrence's Wheat. 557.

Neither delivery of the subject-matter nor registry of the act of sale could lawfully be made; and whatever was unlawfully done was a nullity, leaving the title of the property as if the unlawful act had not been done.

Provision is made by law for the appointment of a register of conveyances in that parish, and it is made his duty to register all acts of transfer of immovable property passed in that city and parish, in the order in which the acts shall be delivered to him for that purpose; and it is provided that acts, whether they are passed before a notary-public or otherwise, shall have no effect against third persons but from the day of being registered. Rev. Stat. La. (1870), p. 613, sect. 3159.

Conveyances of the kind must be registered in the public registry of the parish or district where the prem es are situated. Sess. Acts La. (1827), p. 136; Rev. Stat. La. (1870), p. 613; *Dooley* v. *Delaney*, 6 La. Ann. 67; Code 1824, arts. 2242, 2250, 2417; Code 1870, arts. 2246 to 2266.

Sales of immovable property made under private signature do not have effect against the creditors of the parties nor against third persons in general only from the day such sale was registered according to law, and the actual delivery of the thing sold took place. Art. 2442.

Registration of such a conveyance in another and different district is not notice to third persons, subsequent purchasers, or attaching creditors. *Pierse* v. *Blunt*, 14 La. Ann. 345; *Carraby* v. *Desmarre*, 7 Mart. N. S. (La.) 661; *Wells* v. *Baldwin*, 5 id. 146; *Smith* v. *His Creditors*, 21 La. Ann. 241. State authorities to that effect are numerous; but, inasmuch as the question is one of decisive importance, it is deemed advisable to refer to all the leading cases. *Lee* v. *Darramon*, 3 Rob. (La.) 161; *Gradenigo* v. *Wallett*, 9 id. 14; *Crear* v. *Sowles*, 2 La. Ann. 598; *Tulane* v. *Levinson*, id. 787; *Tear* v. *Williams*, id. 869; Sess. Laws La. (1855), p. 345.

Third persons, with respect to a contract or judgment, are defined by the Code of 1824 to include all persons who are not parties to a judgment or contract; and the same definition is

given to the same phrase by the Code of 1870, which is more immediately applicable to these cases. Code 1824, art. 3522, n. 32, p. 1110; Code 1870, art. 3556, n. 32, p. 428.

Persons having no pecuniary interest in an appeal, and not aggrieved by the decree, are properly denominated third persons in respect to the appeal. *Morrison* v. *Trudeau*, 1 Mart. N. s. (La.) 384; *Williams* v. *Trepagnier*, 4 id. 342; *Lafitte* v. *Duncan*, id. 622; *Succession of Henderson* v. *Cross*, 2 Rob. (La.) 391.

Those not parties to a written agreement or instrument by which their interest in the thing conveyed is sought to be affected are properly designated as third persons in the jurisprudence of that State. *Brosnaham* v. *Turner*, 16 La. 433; *Wade* v. *Marshall and James*, 5 La. Ann. 157; *Williams* v. *Hagan*, 2 La. 125; Code 1824, art. 3522, n. 32; *McManus* v. *Jewett*, 6 La. 537; *Kittridge* v. *Landry*, 2 Rob. (La.) 72.

When the act of sale of the 6th of May was first offered in evidence, it was not accompanied by the certificate of registry, and was excluded, upon the grounds heretofore sufficiently explained. All that need be added in support of that ruling is to say that it is fully sustained by the statute law of the State, and by many decisions of the highest court of the State, to which reference has already been made. Ruled out, as it was, on that occasion, the plaintiff offered it again, with the certificate of registry annexed; and it was again excluded, upon the further ground that the registration was null and void, and inadmissible in evidence, because the vendees at the time, and before and afterwards, were sojourning in the parish of St. Helena, and were enemies of the United States, and, therefore, that the registration of the act of sale could not legally be made.

Sufficient has already been remarked to show that that ruling is correct, unless it be denied that the statute law of the State, and the repeated decisions of the highest court of the State for nearly seventy years, furnish the rule of decision. Since the 24th of March, 1810, it has been law in that State that "no notarial act concerning immovable property shall have any effect against third persons until the same shall have been recorded in the office of the judge of the parish where

such immovable property is situated." 3 Martin's Digest, 140, sect. 7; Rev. Stat. La. (1856) 453; Rev. Stat. La. (1870) 617.

Any discussion of the facts is unnecessary, as it is conceded that the vendor and the vendees were, at the date of the supposed act of sale, resident within the Confederate lines, and that they were enemies of the United States; that the grantor was a member of the Confederate Congress; and that the grantees were officers in the Confederate army, and were engaged in rebellion against the lawful government, from which it follows that a lawful registry of the property could not be made in the parish where it is situated, without which the express statute law of the State is that the supposed act of sale shall not have any effect against third persons.

Nor is there any difficulty in supporting the decision of the court upon the other ground assumed in the ruling; to wit, that the supposed act was but the giving in payment, as understood in the jurisprudence of that State, which is never effectual to pass the title of property in that State, whether movable or immovable, without delivery. It is of the very essence of the *dation en paiement*, say the Supreme Court of the State, that delivery should actually be made. Neither a sale nor a *dation en paiement* can avail against an attaching creditor when there has been no delivery. *Schultz* v. *Morgan*, 27 La. Ann. 616.

Pothier says that a gift in payment is an act by which a debtor gives a thing to his creditor, who is willing to receive it in the place and in payment of a sum of money or of some other thing which is due to him. Pothier, by Cushing, sect. 601, p. 365; 7 Merlin, Répertoire, *verba dation en paiement*, p. 55.

Giving in payment, as defined in the jurisprudence of Louisiana, is an act by which a debtor gives a thing to the creditor who is willing to receive it in payment of a sum which is due; and the decision is that it differs from the ordinary contract of sale in this, that the latter is perfect by the mere consent of the parties, even before the delivery, while the giving in payment is made only by delivery. Code 1824, arts. 2625, 2626. And the Code of 1870 employs the same exact words. Arts. 2655, 2656; *Durnford* v. *Brooks*, 3 Mart. (La.) 222; s. c. id. 269.

Separate examination of the second case in this behalf is quite unnecessary, as it is not pretended that the act of sale from the father to the sons was registered in the parish where the property is situated until nearly six years subsequent to the pretended sale, so that if the universal rule of law is to prevail, that the transfer of immovable property depends upon the law of the place where it is situated, then it is clear that the supposed vendees acquired no title to the premises. *Watkins* v. *Holman,* 16 Pet. 57; *Corbett* v. *Nutt,* 10 Wall. 464; *McGoon* v. *Scales,* 9 id. 23; Lawrence's Wheat. 164, 165.

Wheaton says that the law of the place where real property is situated governs exclusively as to the tenure, the title, and the descent of real property, and the notes of the editor fully confirm the proposition.

War, in our jurisprudence, is not an absolute confiscation of the property of the enemy, but simply confers the right of confiscation. Hence it was early determined that British property found in the United States, on land, at the commencement of hostilities with Great Britain, could not be condemned as enemy property, without a legislative act authorizing its confiscation. *Brown* v. *United States,* 8 Cranch, 110; Lawrence's Wheat. 530.

Discussion of that subject, however, is wholly unnecessary, as the property in question in the cases before the court was confiscated under an act of Congress, which, it is admitted, gave unquestioned jurisdiction to the District Court which entered the decree of condemnation.

From the passage of the act of Congress, it became the duty of the President to cause the seizure to be made; and it is not questioned that the power conferred was properly exercised, nor is it denied in argument that all the proceedings were correct, the only defence in the one case and ground of claim in the other being that the person named in the information as the guilty party was not the lawful owner of the property at the time of the seizure. Most of the grounds of that claim and defence have already been sufficiently examined, and, it is believed, have been fully refuted. Only one more remains for examination, and that is, that the United States are not a third party, within the meaning of the State law, and therefore that

an act of sale never registered in the parish where the property is situated is sufficient to defeat the title of a purchaser derived under the confiscation proceedings and the decree of condemnation.

Such a theory finds no support in the words of the act of Congress, nor is there any authority to sustain it other than what is found in the opinion of the State court in the case now here for re-examination. *Burbank* v. *C. A. & L. L. Conrad,* 27 La. Ann. 152. Cases of the kind are never regarded as authority, for the reason that they are, by the express words of the act of Congress providing for their review, subject to be modified or reversed; nor can it be admitted that there is any foundation for such a rule, as it would render the Confiscation Act a public snare and a delusion.

Subsequent purchasers and attaching creditors, it is admitted, would find protection in such a case; but the argument is, that enemies of the United States engaged in war against the lawful government, and resident in the enemy territory, may defeat the right of the government to punish treason by secret transfers of enemy property situated within the lines of the Federal army, without its being possible for the officers of the United States to ascertain to whom any such transfer was made.

Unlawful registration is no better than none at all, for the reason that, being void, it does not operate as notice to any third party, and, if so, then it follows that neither the United States nor the grantees of the United States had any knowledge that the title of the guilty party had been previously transferred under the laws of the rebel States. Fraud is not imputed to the United States, and it is as certain as truth that the purchasers of the properties were as innocent of fraud as their grantors.

Congress intended by the Confiscation Act, when it was duly executed, to deprive the guilty owner of the means by which he could aid the enemy, and it left in him no estate which he could convey for that or any other purpose. *Wallach et al.* v. *Van Riswick,* 92 U. S. 202.

Where a party, domiciled at the beginning of the war in New Orleans, subsequently went within the rebel lines, and there engaged actively in business, and while so engaged purchased

cotton which, when our army at a later period reoccupied the city, was seized and sold, and the proceeds paid into the treasury, it was held, by the unanimous decision of this court, that the purchase of the cotton was illegal and void, and that it gave the purchaser no title whatever. *Mitchel* v. *United States*, 21 Wall. 350; *Desmare* v. *United States*, 93 U. S. 605. Whatever interest he had in the property had been seized as forfeited to the United States, and placed, pending the suit, beyond his reach or that of his creditor. All subsequently acquired rights were subject to the prior claim of the United States, if perfected by a decree of condemnation. *Pike* v. *Wassell*, 94 id. 711.

Human ingenuity, however great, cannot distinguish the principle ruled in those cases from the case before the court; and still it is insisted in argument that the grantees in the deed from the guilty owner acquired a good title against the United States, without delivery of the property and without legal registration in the parish where the property is situated. Immovable property, says Woolsey, in his treatise on International Law, follows the *lex rei sitæ*, or place where it lies; and he adopts the rule promulgated by foreign writers, that he who wishes to gain, have, or exercise a right to such property betakes himself for that purpose to its place, and subjects himself voluntarily to the local law which rules where the property is situated. Woolsey, Int. Law, § 71.

Foreign codes, jurists, and the decided cases, says Westlake, agree with the common law in maintaining the exclusive claims of the *situs* to the jurisdiction concerning immovables. Differences of opinion, it is said by Burge, exist among jurists as to the rule of decision where the contract affects the person as well as things; but he says there is no difference among them in adopting the *lex loci rei sitæ* in all questions regarding the modification or creation of estates or interests in immovable property. 2 Burge, Com. on Col. & For. Laws, c. 9, p. 841.

Obligations to convey, if they be perfected *secundum legem domicilii*, may be binding; but the conveyances themselves of immovable property will not be effectual, unless executed according to the requirements of the local law. In the conveyance of immovable property, or of any right affecting the same, the

grantor must follow the solemnities of the law of the place in which the property lies, and from which it is impossible to remove it; for, though he be subject with respect to his person to the *lex domicilii*, that law can have no authority over property which has its fixed seat in another political jurisdiction, and which cannot be tried but before the courts and according to the laws where it is situated.

Two fatal defects, therefore, exist in the supposed title of the sons to the properties in controversy, as shown by the most conclusive evidence: 1. That the subject-matter of the respective sales was never delivered to the supposed grantees, as required by the *lex loci rei sitæ.* 2. That neither of the supposed acts of sale was ever lawfully registered in the parish where the property is situated, from which it follows, in case either of the alleged defects is shown, that the decree of condemnation vested the title to the same in the United States.

Apply those rules to the the before the court, and it is clear that the judgment in the first case should be affirmed, and that the judgment in the second case should be reversed.