# WHEELING.

GRINNAN *et al. v.* EDWARDS *et al.*

Submitted January 25, 1883— Decided April 7, 1883.

1. Where a vendee, who before the beginning of the late civil war, and during the continuance thereof, resided in Madison county, Virginia, east of the Allegheny mountains, purchased a tract of land before the commencement of said war, situated in Fayette county, Virginia, from his vendor who then resided, and who during said war continued to reside, in the county of Kanawha, Virginia, partly for cash, and partly upon credit, payable in installments, which did not become due, until after the proclamation of the president of the United States, dated the 16th day of August, 1861, declaring certain States, and parts of States, in a state of insurrection against the government of the United States, the right of the said vendor to a specific execution of said contract from the 16th day of August, 1861, to the end of said war, was suspended; and during the same period, it became and *was unlawful* for such vendee to enter the military lines of the United States to pay said instalments as they became payable.  (p. 358.)

2. Where said vendor during said war, and while said vendee continued to reside in said county of Madison and within the mili-

tary lines of the Confederate States, instituted his suit in chancery in the circuit court of Kanawha county, then a part of West Virginia, against said vendee to sell said land to pay said unpaid purchase-money, alleging in said bill that all of the defendants therein were non-residents of this State, and that they resided in the State of Virginia, east of the Blue Ridge ; and where none of the defendants in said suit appeared thereto, or was served with process thereon, but the bill was taken for confessed against them upon an order of publication only, and where the land was sold under a decree in said cause, rendered upon said bill so taken for confessed, and was purchased by said vendor. HELD : That such decree is absolutely void ; and in a suit brought by such vendee against said vendor, to enforce the specific execution of the contract for the sale of said land will be treated as a nullity.   (p. 360.)

3.  Where during the late civil war defendants who resided within the military lines of the Confederate States were sued in the courts of this State and within the military lines of the United States ; and where such defendants were by the laws of the United States or the laws of this State, prohibited from appearing or remaining in this State, and thereby prevented from making defense to such suit, such prohibition will be treated as a denial of their right to make such defense, and equivalent to striking out their appearance and defense after the same had been in fact made.   (p. 361.)  .

4.  The said vendor having become the purchaser of said land under such decree, and subsequently conveyed the same to other parties, neither he nor they *thereby* acquired any valid title or claim to said land.   (p. 364.)

5.  The said vendee having purchased the said land for himself and also as trustee for other parties whose interest appears upon the face of the title-bond executed to him by said vendor, for the conveyance of the legal title thereto, such beneficiaries were necessary parties in any suit instituted by said vendor to sell the said land to satisfy said unpaid purchase-money ; and not having been made parties to such suit, they are not bound by the decree rendered therein.   (p. 366.)          •

6.  The said vendor having purchased said land under the said decree, for a sum largely in excess of the amount therein decreed to him, and never having paid the same, as required by said decree, would, in case said decree be held valid, hold the same as trustee for the use of said beneficiaries, according to their several interests therein.   (p. 367.)

7.  In such a case, the said vendee and said beneficiaries, have the right to maintain an original bill against the said vendor, and his said alienees to enforce the specific execution of said contract, notwithstanding said decree.   (p. 367.)

Appeal from a decree of the circuit court of the county of Kanawha rendered on the 5th day of December, 1881, in a cause in said court then pending, wherein A. G. Grinnan and others were plaintiffs, and W. H. Edwards and others were defendants, allowed upon the petition of said plaintiffs.

Hon. F. A. Guthrie, judge of the seventh judicial circuit, rendered the decree appealed from.

WOODS, JUDGE, furnishes the following statement of the case:

At the March rules 1875, the plaintiffs, Abigail H. Smith, Andrew G. Grinnan in his own right, and as trustee for Wm. K. Smith, F. B. Chewning and his wife Elizabeth Chewning sole heir of the said Wm. K. Smith then dead, filed their bill in the circuit court of Kanawha county against William H. Edwards and P. W. Morgan, administrator of the said William K. Smith, alleging in substance, that a tract of five thousand acres of land in Fayette county in this State, which had been conveyed in trust to John H. Platt, trustee, by deed dated the 7th day of October, 1857, to secure to the said Wm. H. Edwards the payment of eight thousand four hundred and seventeen dollars and twenty cents with interest thereon from the 1st day of October, 1858, due to him from said Wm. K. Smith, was with other lands conveyed by said Smith to the said A. G. Grinnan by deed dated the 29th day of October, 1857; that the said Grinnan by an article of agreement between himself and said Smith dated the 10th day of February, 1859, agreed to hold the said lands, conveyed to him by said deed of the 29th of October, 1857, which included said tract of five thousand acres, upon trust, *first*, to encumber the same to raise money to pay the expenses of selling the same; to sell the said lands or any part thereof, and out of the proceeds of such sales pay the amounts due or which may become due to said Grinnan from said Wm. K. Smith, or for which the said Grinnan may become liable as the surety of the said Smith, either before or after the said 10th day of February, 1859, including the sum of four hundred and thirty-eight dollars with interest from the 1st day of February, 1859, due to said Grinnan upon an open account, and seven hun-

dred and fifty-eight dollars with interest from the — day of October, 1857, due from said Smith to the said Grinnan as the guardian of Wm. H. Conway's children, together with the expenses incurred by him in selling or endeavoring to sell said lands, and also a remuneration for selling the same of at least five *per centum* on the amount of such sales. *Secondly*, to pay such debts of the said Wm. K. Smith, as he might in writing acknowledge to be just, excepting only one debt due to Dodge, Bacon & Co., and including a debt of twenty-five thousand dollars due to the said Abigail H. Smith, to be held by said Grinnan in trust for her separate use, subject to her disposal by will or order, and to pay her annually the interest thereon, and also to pay to the said F. B. Chewning the sum of at least one thousand dollars with power to said Grinnan to sell or exchange the said lands or any part thereof for other property or real estate, to be held upon the same trusts.

The bill also alleged, that by another agreement made between the said Wm. K. Smith, Abigail H. Smith and A. G. Grinnan, dated the 15th day of June, 1859, it was further agreed, that in consideration that the said Abigail H. Smith should relinquish her right of dower in said lands conveyed by said Wm. K. Smith to the said Grinnan by said deed dated October 29, 1857, the said Grinnan was to retain *one tenth* of the proceeds of the sales of all said lands in trust for said Abigail H. Smith as her separate estate; that the said John H. Platt, trustee as aforesaid, on the 19th of May, 1860, sold and conveyed the said five thousand acres under the provisions of said deed of trust to the said Wm. H. Edwards; that in pursuance of an agreement with the said Grinnan the said Edwards and his wife Catharine executed to the said Grinnan a title-bond dated the 15th day of October, 1860, in the penalty of twelve thousand dollars reciting that the said Edwards and wife had sold and agreed to convey to said Grinnan said tract of five thousand acres to be held by him as follows: one half thereof as trustee for Wm. K. Smith upon the same terms specified in said agreements dated the 10th of February, 1859, and the 15th of June, 1859, and the residue in his own right in the same manner, and to the same extent, as the same was held by him, on the 27th of

April, 1860, under and by virtue of said deeds of the 1st of October, 1857, and of the 29th October, 1857, except that it is not subject to said deed of trust to John H. Platt, trustee, dated October 7, 1857, and that the whole of said tract of five thousand acres was to be held by the said Grinnan upon trust to pay to the said Abigail H. Smith, *one tenth* of the net proceeds of the sale of said land; and reciting further that they had sold and agreed to convey said land for the price of nine thousand three hundred and ninety-eight dollars and thirty-one cents payable as follows: three thousand dollars cash in hand, and the residue in two equal insallments in twelve and fifteen months thereafter with interest from the date thereof at seven *per centum per annum*, with the right reserved to the said Edwards to reclaim the said land upon certain conditions not necessary to be here stated.

The bill further alleges, that the date of said title-bond and tor many years before the beginning of the war, and at the beginning thereof, during its continuance, and since the said war ended, the said A. G. Grinnan resided *east of the Blue Ridge*, in Madison county, Virginia, near to Orange Court House, and within what was then known as the Confederate States, and within the military lines of the Confederate States, and therefore upon the opposite side of the military lines from the said William H. Edwards and wife, who then resided in the county of Kanawha in Virginia; that the plaintiffs Abigail H. Smith, Wm. K. Smith, F. B. Chewning and his wife Elizabeth Chewning, who is the sole heir of said Wm. K. Smith, during the said war 1861–5, and before and since said war, resided in Spottsylvania county in Virginia, and within the Confederate States, and within the military lines thereof, and on the opposite side of the United States military lines from said county of Kanawha. Said bill further alleges that the said William H. Edwards on the 11th of December, 1863, instituted his chancery suit, and at the January rules 1864 filed his bill in the circuit court ot Kanawha county, against said A. G. Grinnan, Wm. K. Smith and Abigail H. Smith alleging the execution of said title-bond dated October 15, 1860, the sale of said five thousand acres of land to have been made to the said A. G. Grinnan *and Wm. K. Smith* for the price and upon the payments

specified in said title-bond filed with said bill as exhibit "A," and averred the non-payment of the deferred installments, and that *all and each* of the said defendants, A. G. Grinnan, Wm. K. Smith and Abigail H. Smith were non-residents of West Virginia and resided in Virginia east of the Blue Ridge, and praying a sale of said lands to pay said deferred installments of purchase-money, and for general relief; that no process in said cause was served upon either of the said defendants therein, and they were proceeded against as non-residents of this State upon order of publication only, and upon said bills thereon, taken for confessed against them; that on the 14th of June, 1864, a decree was rendered in said cause against the said Grinnan *and Wm. K. Smith,* upon said bill so taken for confessed; that they pay to said Wm. H. Edwards the sum of six thousand three hundred and ninety-eight dollars and thirty-one cents, with lawful interest thereon from the 15th of October, 1860, and costs, and in case default in the payment thereof should be made for thirty days, a commissioner appointed by said decree was directed to sell the said five thousand acres of land; that the said land was so sold, and at said sale said Edwards became the purchaser thereof at the price of nine thousand dollars, which sale was reported and confirmed at the October term of said court 1864, and that said commissioner by deed dated December 14, 1864, conveyed the said land to said Wm. H. Edwards who since that date has been in possession, and taken the rents and profits of said land, which ought to extinguish the interest accruing on said six thousand three hundred and ninety-eight dollars and thirty-one cents from that date; that the plaintiffs on the 29th of December, 1869, tendered and asked leave to file their petition in said cause praying to be made defendants therein, to permit them to make defense thereto and to rehear said cause, which was rejected; that they took an appeal to the Court of Appeals from said decree of the 14th of December, 1864, which was dismissed; they further allege that they have always been ready, and are still ready to pay to the said Wm. H. Edwards whatever amount of said purchase-money may be justly due to him, and they pray that the said deed made by said commissioner to said Edwards may be canceled; that

said decree may be declared null and void; that the said
Wm. H. Edwards may be compelled specifically to perform
his contract set forth in said title-bond, and to convey to
the said A. G. Grinnan the legal title to said land upon pay-
ing to him the balance of said purchase-money; that posses-
sion of said land be restored to them, and that he account for said
rents and profits, and for general relief, and that if the court
should deem it proper to do so, they pray that their said bill
may be treated as a bill of review in said cause brought
against them by said Edwards.

The plaintiffs on the 16th of May, 1877, by leave of the
court, filed in this cause an amended bill against the same
defendants, further alleging that they could not answer said
bill and defend their interests in the said suit of *Edwards*
against *Grinnan, &c.*, because they were disabled by the
statute law of West Virginia, requiring them to take the
suitor's test oath, which they could not conscientiously do;
that the price of nine thousand dollars, which said Edwards
purchased said land under his said decree, was nearly one
thousand dollars in excess of the amount of his said decree
including all costs and expense, for which he executed no
obligation, and which he never paid, and which excess is
due from him to the said plaintiffs; that the said Wm. H.
Edwards, on the 21st of May, 1878, filed his answer to said
bills, setting up various matters of defense, and alleging that
he had conveyed said land to certain parties named by him,
and suggested that they were necessary parties in the said
suit, to which answer no replication was filed; and that sub-
sequently a supplemental bill was filed against the same de-
fendants, and certain other defendants to whom the said
Wm. H. Edwards had conveyed said five thousand acres of
land, after he purchased the same under his said decree, as
alleged in his said answer and praying in said amended and
supplemental bills for the same relief, as prayed for in said
original bill, and for general relief.

The defendants appeared in court and demurred gener ally
to the said original and amended bills, which demu rrers
were sustained and said bills dismissed with costs.

From this decree the said plaintiffs have obtained an ap-
peal to this Court.

*N. Fitzhugh* and *S. A. Miller* for appellants cited the following authorities : 17 Wall. 438 ; 11 Wall. 581 ; 18 Wall. 106 ; 6 Wall. 533 ; Freeman Judgments § 121 and note ; 4 Munf. 222 ; 1 Leigh 179 ; 1 Lead. Cas. Eq. (Part I.) 32 ; 2 Lead. Cas. Eq. (Part I.) 31.

*Smith & Knight* for appellees cited the following authorities : 10 Gratt. 284 ; 9 Gratt. 131 ; 5 W. Va. 111 ; 10 Leigh 507 ; Code ch. 134 ; *Id.* ch. 135 ; 3 Gratt. 98 ; 6 Gratt. 442 ; Acts 1872 ch. 69 ; 7 W. Va. 284 ; 18 Wall. 106 ; 11 Wall. 289 ; Code Va. (1860) ch. 171, § 19 ; 3 Gratt. 237 ; Story Eq. Pl. §§ 503 and note, 751 ; 3 Gratt. 134 ; Freeman Judgments §§ 29, 30 ; 3 Gratt. 148 ; 1 Leigh 108 ; 6 Leigh 208 ; 1 Rob. 28 ; 9 W. Va. 618 ; 8 Pet. 61 ; 7 Pet. 171.

WOODS, JUDGE, announced the opinion of the Court :

This cause was heard and determined in the court below, upon the demurrers to the plaintiffs' original and amended bills and therefore every allegation thereof upon consideration of said demurrers is taken to be true. It is therefore admitted, that the plaintiff, Andrew G. Grinnan, on the 15th of October, 1860, who at that time, and for many years prior thereto, resided in Madison county, Virginia, where he continued to reside during the continuance of the civil war, entered into a contract with the defendant, William H. Edwards, whereby he sold, and agreed to convey to the said Grinnan a tract of land in Fayette county, Virginia, containing five thousand acres, at the price of nine thousand three hundred and ninety-eight dollars and thirty-one cents, of which three thousand were in hand paid and the residue, was to be paid in two equal installments which respectively became payable on the 15th of October, 1861, and the 15th of January, 1862, bearing interest from the date of said purchase, at the rate of seven per centum per annum ; that at the date of said purchase, the said Edwards and his wife, made and delivered to the said Grinnan, a title-bond, in the penalty of twelve thousand dollars with condition, upon the payment of said purchase-money to convey the said land to said Grinnan in trust, as follows : one half thereof as trustee for said William K. Smith, to be held upon the same terms as are

specified in said agreement dated the 10th of February, 1859, and the residue to his own use, in the same manner, and to the same extent as he held the same on the 27th of April, 1860, under said deeds from said Smith and wife, to said Grinnan dated respectively October 1, 1857, and October 29, 1857, and the *whole* of said tract to be held by said Grinnan upon trust to said Abigail H. Smith for one tenth of the net proceeds of the sale of the said land. It is further admitted, the said interest of said Wm. K. Smith, in the hands of said Grinnan was with other lands charged with the payment of twenty-five thousand dollars to said Abigail H. Smith, and ten thousand dollars to said plaintiff B. F. Chewning; and that before either of said installments became due the said war began, and that payment thereof was, for that cause not made, and could not lawfully be made.

The first questions arising on this state of facts are, what was the relation existing between said contracting parties, after the commencement, and during the continuance of the war; and what effect did the war have while it continued, upon the rights of the said parties under the said contract?

It is a well settled doctrine, among civilized nations in modern times that the law of nations is a part of the municipal law, and that the government of the United States, and of the several States composing the same, are bound by it, until the United States shall by act of Congress otherwise determine for itself.

By the proclamations of the President of the United States dated the 19th and the 27th of April, 1861, respectively, a blockade of the ports of South Carolina, North Carolina, Georgia, Alabama, Florida, Mississippi, Louisiana, Texas and Virginia was declared to exist, and the proclamation of Commodore Pendergast, dated the 30th day of April, 1861, announced to the world, that the blockade so declared was established. These proclamations, were the solemn, authorized declarations of the government of the United States in the exercise of its sovereign power, that a state of war existed between the said States, and the government of the United States, to continue until otherwise determined by Congress, or until resistence to the government of the United States within the said States shall cease.

A blockade, is the exercise of a belligerent right; before a blockade can be declared, a war must exist; and a blockade lawfully declared, is conclusive evidence that a state of war exists between the nation declaring such blockade, and the nation whose ports are blockaded.

That such a state of war existed between the government of the United States, and the several States named in the President's proclamations before referred to, and that said blockade was lawfully declared, and had become efficient, were questions fully considered and settled by the Supreme Court of the United States, in the "Prize Cases," reported in 2d Black's Repts. p. 635.

If any doubts had existed as to the actual existence of a state of war, at the date of said blockade, they were dispelled by the act of Congress passed on the 13th of July, 1861, and by the proclamation of the President of the United States, issued in pursuance thereof, on the 16th of August, 1861. By the 5th section of the said act of Congress it is, among other things enacted, that where such a state of facts, as is therein mentioned exists, "it may, and shall be lawful for the President, by proclamation to declare, that the inhabitants of such State, or any part or section thereof, where such insurrection exists are in a state of insurrection against the United States; and thereupon all commercial intercourse, by and between the same, and the citizens thereof, and the citizens of the rest of the United States, shall cease and be unlawful, so long as such condition of hostility shall continue; and all goods and chattels, wares and merchandise, coming from said State or section into the other parts of the United States, and all proceeding to such State or section, shall be forfeited to the United States." Acting under the authority of said 5th section of said act, the President of the United States issued his proclamation dated the 16th day of August, 1861, and thereby declared "that the inhabitants of the States of Georgia, North Carolina, South Carolina, Virginia, Tennessee, Alabama, Louisiana, Texas, Arkansas, Mississippi, and Florida, except the inhabitants of that part of the State of Virginia lying west of the Allegheny mountains, and of certain other sections not necessary to be named, were in a state of insurrection against the United States, and

that all commercial intercourse between the same, and the inhabitants thereof (with the exceptions aforesaid) and the citizens of other States, and other parts of the United States, is unlawful, and will remain unlawful, until such insurrection shall cease, or has been repressed; and that all goods and chattels, wares, and merchandise, &c., coming from any of said States with the exceptions aforesaid, into other parts of the United States, without special license, &c., will be forfeited to the United States."

By said act of Congress, and said proclamation of the 16th of August, 1861, the legal status of the said plaintiffs and the defendant Wm. H. Edwards, from that date, until the termination of the civil war was determined. What was this legal status then existing between them? A war having been declared, or recognized to exist between two belligerents, whether it be a foreign or a civil war, what is its effect upon their citizens, or subjects? They thereby become enemies of each other. What then, is an enemy? By the law of nations, an enemy is defined to be, "one with whom a nation is at open war." "When the sovereign ruler of the State declares war against another sovereign, it is understood, the whole nation declares war against that other nation; all the subjects of one, are enemies to all the subjects of the other and during the existence of the war, they continue enemies in whatever country they may happen to be," and all persons residing within the territory occupied by the belligerents, although they in fact are foreigners, are liable to be treated as enemies. Vattel Law of Nations, book 3 ch. 5 sec. 69–71; Halleck's Int. Law, ch. 17 sec. 8; *White* v. *Burnley* 20 How. pp. 249–250, and 2 Black p. 636.

While the extreme right of war, authorizes the individuals of one party to kill and destroy the individuals of the other party, whenever milder means are insufficient to conquer them or to bring them to terms, yet this extreme right has been modified and limited by the usages and practices of modern warfare; but the right is universally conceded to each belligerent, to make prioners of war of the subjects of the other, even though they may be non-combatants, if deemed necessary to its safety, or as a means of weakening the other. Halleck Int. L. ch. 22 sec. 1 and 2. Hence it

follows that no subject of one belligerent, without special license to do so, can enter the territory of the other without being liable to be apprehended, held, and treated as a prisoner of war.

Applying these well settled principles of the law of nations, to the facts in the case at bar, it will be apparent, that from and after the 16th of August, 1861, it was unlawful for said Grinnan, Wm. K. Smith and Abigail H. Smith to appear in any part of the State of Virginia lying west of the Allegheny mountains. They were by the law as effectually forbidden to do so, as if they alone, of all the people in Virginia, residing east of said range of mountains, had been, by special order of the commander-in-chief of the armies of the United States forbidden to do so. The attempt to do so would have been at the peril of their liberty; and all moneys and property found in their possession, would have been liable to have been forfeited to the United States. The war therefore rendered it impossible for said Grinnan to pay said purchase-money to the said Edwards, in that part of Virginia lying west of said mountains, or for said Edwards to go to receive the same, in that portion of Virginia lying east of said mountains. This condition of affairs cannot be said to have been the fault of either of them; it was the common misfortune of both, caused by the existence of the war, and by the accident of their residence, in hostile territory.

Another consequence of the war, equally embarrassing to said Grinnan and Edwards, arose from another well settled principle of the laws of nations, which declares, that a declaration, or recognition of war, effects an absolute interruption and interdiction of all commercial intercourse and dealings between the subjects of the two countries. The war puts an end at once, to all dealings and communications with each other; "all contracts made with the enemy during the war, are null and void; it prohibits the deposit of funds in the enemy's country, or the remission of funds to the subjects of the enemy, and this inhibition reaches to every communication direct or circuitous. The subjects of the belligerent States cannot commence or carry on correspondence or business together, and all co-partnerships existing between the subjects of the parties prior to the war, are dissolved by the

mere force and act of the war itself; though other contracts existing prior to the war, are not extinguished, but the remedy to enforce them is suspended, and this from the inability of an alien enemy to sue, or sustain, in the language of the civilians, a *persona standi in judico.*" Halleck's Int. L. chap. 17, sec. 9; 1st Kent Com. p. 66–68; *Hanger* v. *Abbott*, 6 Wall. p. 535. Justice Clifford pronouncing the opinion of the court in that case, quoting and approving the doctrine of Mr. Chitty, says "we suspend the right of the enemy, to the debts our traders owe, but we do not annul the right; with the return of peace, we return the right and remedy." During the war, all postal and other means of friendly intercourse between the countries of the belligerents cease; every effort is put forth by them, to prevent information of their internal, social, or political condition from reaching the other party; a practice enjoined and required by the necessities of self-preservation, and any violation of this rule by a subject of such belligerent is liable to incur the severest punishment. During the existence of the war, the courts of one belligerent are closed to the subjects of the other; he cannot sustain any contract in the tribunals of the other belligerents; the restoration of peace removes the disability, and opens the doors of the courts. Absolute suspension of the right, and prohibition to exercise it, exist during the war by the law of nations. Ability to sue, was the status of the creditor, when the contract was made; the effect of the war, is to suspend the right, under circumstances which make it his duty to abstain from any attempt to exercise it. "The suspension of the remedy during the war, is so absolute, that the courts of justice will not even grant a commission to take testimony in an enemy's country; but when the reason for the suspension ceases, the right to prosecute revives." *Hanger* v. *Abbott*, 6 Wall. p. 535 –541. By the terms of the title-bond hereinbefore referred to, the plaintiff Grinnan bound himself to pay to the defendant Wm. H. Edwards, the last of said installments on the 15th of January, 1862, on which day the said Edwards by the same instrument bound himself, to convey said land to said Grinnan, on the payment of said last installment. The existence of the war made such payment unlawful, and therefore impossible. It also made it impossible and unlawful to

execute said conveyance, as acceptance by the grantee is necessary to a valid deed, which implies the presence of the grantee, or his agent appointed for that purpose after the war began in that portion of Virginia lying west of the Allegheny mountains, both of which were unlawful, and in effect prohibited. The right to a specific execution of said contract was mutual; the plaintiff Grinnan, holding said purchase-money in trust for said Edwards, and he in turn holding the legal title to said land in trust for said Grinnan, who in turn was to hold the same in trust for the said plaintiffs, as already stated.

We are therefore brought to the conclusion, that as the courts of Kanawha county, which was situated in that part of Virginia lying west of the Allegheny mountains, were closed against the said plaintiffs to enforce a specific execution of said contract in their behalf, the remedy of the said Edwards to enforce the specific execution of said contract on his behalf was suspended from and after the 16th day of August, 1861, during the continuance of the said war; and that during such period it became, and was unlawful for the plaintiffs to pay to the said Edwards the purchase-money due upon said land.

Upon said demurrer it is further admitted, that on the 11th day of December, 1863, during said war, while the said plaintiffs were prohibited from entering the said county of Kanawha, or any other portion of Virginia lying west of the Allegheny mountains, and thus excluded from the courts thereof, the said William H. Edwards brought his said suit in the circuit court of said county of Kanawha, against the plaintiffs Grinnan, Abigail H. Smith and the said Wm. K. Smith, all of whom then resided in that portion of Virginia lying east of said mountains, to enforce the specific execution of said contract, and without personal service of process upon any of said defendants therein, without any proceedings by attachment, but upon *order of publication only*, obtained a decree therein, for the sale of said land to satisfy said unpaid purchase-money; that the land was sold under said decree and was purchased by said Edwards at the price of nine thousand dollars, a sum in excess of the amount of his said decree of nearly one thousand dollars which he has never yet paid.

Upon this state of facts, the further questions arise, viz: what is the legal character of the decree thus obtained by said Edwards against the said plaintiffs; and what is its effect, if any, on their right now claimed by them, to enforce the specific execution of said contract?

It is unnecessary to discuss or consider here, whether the proceedings in said chancery suit are erroneous or not. If the said court had jurisdiction to render said decree, it is wholly immaterial what errors it may have committed therein; such decree cannot be assailed in any collateral proceedings on account of such errors. They can only be corrected by some appellate proceeding, in the manner, and within the period prescribed by law. While such proceedings may not be collaterally assailed, for errors therein, if it appear that the court had jurisdiction thereof, yet this Court may look into them to enable it to determine whether the proper parties thereto were before the court, and whether these plaintiffs have any rights resulting therefrom, or arising out of the same, in case it should be held that the court in rendering said decree had jurisdiction in the premises; and especially would this be proper to be done, when it is admitted, that after satisfying the amount of said decree in favor of said Edwards, a large surplus, arising from the sale of said land, still remains in his hands.

In every judicial proceeding, in order to obtain a valid and binding adjudication, there must be a plaintiff, a defendant and a judge. The plaintiff by bringing his suit, submits himself to the jurisdiction of the court; the defendant is cited or warned to appear and defend himself against the plaintiff's demand, if he can do so; he may be summoned in person; his appearance may be constrained by the seizure of his person or his property, or both. As a man's property is always presumed to be in his own possession or that of his lawful agent, a seizure thereof may be presumed to bring its owner with it, into court. Other forms of notice are sometimes, and for some purposes, held to be equivalent to personal service. An order of publication against defendants, duly executed, when authorized by law, is in many cases, held as equivalent to personal service. But in whatever manner the defendant may be cited to appear, in any judicial proceedings,

such summons, citation, or order of publication, necessarily implies, that the defendant so cited may appear in such court, in person, or by his counsel, and there remain, free to make his full defense to said proceeding, and that in doing so, he shall have the aid and protection afforded by the process of said court. It is well settled that "wherever a party may rightfully be sued, *there* he has the right to appear and make defense, for the liability and the right are inseparable. A sentence of a court pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal." *McVeigh* v. *U. S.*, 11 Wall. 267; *Windsor* v. *McVeigh*, 3 Otto 274. In the last named case, Field, justice, delivering the opinion of the court, says, "that there must be a notice to the party of some kind, actual or constructive, to a valid judgment affecting his rights is admitted. Until such notice is given the court has no jurisdiction in any case to proceed to judgment, whatever its authority may be, by the law of its organization over the subject matter. But notice, is only for the purpose of affording the party an opportunity of being heard upon the claim, or charges made; it is a summons to him to appear and speak, if anything he has to say, why the judgment sought, should not be rendered. A denial to a party of the benefit of a notice, would be to deny that he is entitled to notice at all. The law is, and it always has been, that whenever a citation or notice is required, the party cited, has the right to appear, and be heard, and when the latter is denied, the former is insufficient for any purpose. The denial to a party of the right to appear is in legal effect to recall the citation to him."

The same doctrine was held by the Supreme Court of the United States in *Dean* v. *Nelson*, 10 Wall. 172; *Lasere* v. *Rochereau*, 17 Wall. 437; and in *Ludlow* v. *Ramsey*, 11 Wall. 581. In *Dean* v. *Nelson*, the facts are substantially these: Dean owned two hundred and four shares of the capital stock in the Memphis Gaslight Company of the value of twenty thousand four hundred dollars. In May, 1861, he transferred this stock to Peppers, who in June, 1861, transferred the same to Nelson at its par value, and for the purchase-money therefor, took his notes, secured by two mortgages upon said

stock and other property, with the usual condition to be void upon payment of said notes, which notes and mortgages were transferred to Dean. In June, 1862, Nelson transferred one hundred and ninety-four shares of said stock to his wife, and the residue ten shares to one May. In April, 1863, said Nelson and wife by a military order, were driven south of the lines of the military forces of the United States, and forbidden to return. May was within the Confederate lines during all the war. During their enforced absence, Nelson on the 1st of September, 1863, brought his suit within the military district of Memphis, against said Nelson and wife and May to foreclose said mortgages. They were not served with personal notice in said suit, but an order of publication against them notifying them to appear was entered, and duly executed. No appearance was effected, the mortgages were foreclosed, the said stock was sold and purchased by Hanlin, who transferred the same to Dean. In June, 1865, Nelson, his wife, and May, filed their bill in the circuit court of the United States for the district of West Tennessee, against said Dean claiming the said stock, and praying that the same might be transferred to them. Dean claimed title to said stock under the said decree of foreclosure. Upon the hearing, the said circuit court decreed that Dean transfer to Mrs. Nelson one hundred and ninety-four shares, and to May the remaining ten shares of said stock. From this decree Dean obtained an appeal to the Supreme Court of the United States, which affirmed the said decree. Bradly, Justice, delivering the opinion of the court in that case, speaking of the order of publication therein, says : " A notice to said defendants Nelson, his wife and May published in a newspaper, was a mere idle form. They could not lawfully see it, or obey it. As to them the proceedings were wholly void and inoperative, and that the decree of foreclosure, so obtained against them left the equity of redemption in the mortgaged property unextinguished, and they therefore still had the right to redeem it."

The case of *Lasere* v. *Rochereau*, was in its main features similar to *Dean* v. *Nelson*. Lasere who resided in New Orleans, had executed two mortgages, on a house and lot situated therein. On the 15th of May, 1863, by a military order,

he was driven within the lines of the Confederate States, where he remained until April, 1865, when he returned to New Orleans. During his absence the mortgages were foreclosed, without personal service of process on Lasere, and his property was sold under said proceedings. Soon after his return he brought suit to vacate said proceedings of foreclosure, which terminated in a judgment against him. To this judgment Lasere obtained a writ of error to the supreme court of Louisana, and thence to the Supreme Court of the United States which reversed said judgment. Swayne, Justice, delivering the opinion of the court in the last named case, says: "It is contrary to the plainest principles of reason and justice, that anyone should be condemned as to person or property without an opportunity to be heard. During his absence, he had no legal right to appoint an agent, or to transact any other business in New Orleans. Lasere doubtless knew nothing of the proceedings against him; and if he had had such knowledge, he was powerless to do anything to protect his rights. The case of *Dean* v. *Nelson*, which this Court has condemned, is substantially the one before us now."

We are therefore, upon principle and authority constrained to hold, that where a judicial proceeding has been instituted against any person affecting his life, liberty or property, and such person has been prohibited by competent authority, from appearing in said court, and making defense to such judicial proceeding, that a judgment or decree rendered therein against him, is *wholly inoperative and void*, and being *void* it is in legal effect, no judgment. "By it, no rights are divested, from it no rights can be obtained. Being worthless itself, all proceedings founded on it are equally worthless. It neither binds nor bars anyone. All acts performed, and all claims flowing out of it are void. A purchaser at a sale by its authority finds himself without title, and without redress. No resulting equity in the hands of third persons, and no power residing in any legislative, or other department of government, can invest it with any power or validity, and it may be assailed in any collateral proceeding." *Neal* v. *Utz*, 75 Va. 484; Freeman L. of Judts. sec. 117.

Applied to the case at bar, these principles operate with resistless force, against the claim of title made by the said

Edwards and his alienees, derived from the sale made under the authority of said decree, relied upon by them to resist the right of the said plaintiffs to have a specific execution of said contract. In the case at bar, the said plaintiffs at the making of said purchase on the 15th October, 1860, all resided in that part of Virginia lying east of the Allegheny mountains, and there they continued to reside during the whole period of the war. By the existence of the war, they and the said Edwards became legal enemies to each other, before said unpaid purchase-money became due. The plaintiffs lived in the territory of one belligerent, and the said Edwards, in the territory of the other; the plaintiffs dare not cross the military lines of the United States. They were, by the law of nations, as well as by the laws of Congress, and the proclamations of the President of the United States, expressly forbidden to do so, and all intercourse was prohibited, and therefore unlawful. When they were sued by said Edwards in the circuit court of Kanawha county, they were notified by order of publication and warned to appear and make defense; the laws of the United States prohibited them from doing so in person, and we have seen they could not appoint an attorney or agent to appear for them; it was unlawful for them to obey such order of publication, or even to see it; and to crown all, and make their disabilities absolutely insurmountable, the convention sitting at Wheeling to re-organize the State government of Virginia, by an ordinance passed the 19th of June, 1861, "To authorize the apprehending of suspicious persons in time of war," empowered the Governor to cause to be apprehended and secured, or to compel to depart the State, all suspicious persons of any foreign State or power at war with the United States; and thereby declared in effect, that all persons residing in Virginia, adhering to, and supporting the convention at Richmond or professing allegiance or obedience to the same, were " citizens of foreign States at war with the United States"—in fact were alien enemies—and were liable to be arrested on the warrant of the Governor, and either imprisoned or exiled. By an act of the General Assembly of the restored government of Virginia passed on the 4th of February, 1862, it was in substance enacted that during the existence of the war, it should be lawful for the

jailer of any county to receive into his jail and there safely keep "any person whatever, who might be delivered to him by the written order of the *Governor*, or of *any military officer* of the United States, without *warrant, precept or commitment*, until discharged under the laws of the United States, or by the Governor, or by the officer by whose order such persons were confined, or by an order from an officer of superior rank."

With all these disabilities imposed, and all these perils to life, liberty and property impending, it would have been folly and madness for the plaintiffs Grinnan, Abigail H. Smith, or said Wm. K. Smith to have attempted to appear, and defend their interests in the said suit brought against them by said Edwards, in the circuit court of Kanawha county.

We therefore hold, that the said disabilities and prohibitions, operating on said Grinnan, William K. Smith and his wife said Abigail H. Smith, effectually prevented them from appearing, and making their defense to the said suit brought against them in the circuit court of Kanawha county, and that the same will be treated as a denial of their right to appear and make such defense, and as equivalent to striking out their appearance and defense, after the same had in fact been made; and that therefore, the said decrees, rendered by the circuit court of Kanawha in favor of said Wm. H. Edwards, in his said suit against said Grinnan, Wm. K. Smith and Abigail H. Smith, and all proceedings under the same, are null and void, and that the same shall not in any wise impair the right of the plaintiffs to enforce the specific execution of said contract for the purchase of said five thousand acres of land.

As a result from the principles here established, it follows, that, when the said Edwards became the purchaser of said land at a sale thereof made under his said decree, and subsequently conveyed the same to said Sarah S. Tappan, Gilkerson, &c., neither he, nor they, acquired thereby any valid title or claim to said land.

But if we admit for the sake of the argument, that all of the proceedings in the said suit of *Edwards* v. *Grinnan, &c.*, were in all respects valid, yet the plaintiffs may maintain

their said bills against the said defendants for the whole, or at least part of the relief prayed for therein.   The demurrers admit that when Grinnan purchased said land from Edwards on the 15th day of October, 1860, he in fact, purchased one half thereof for the use of said Wm. K. Smith in trust among other things, to secure to the plaintiff B. F. Chewning one thousand dollars.  He, therefore possessed a large and valuable interest in said land at the time said Edwards brought his suit to sell the same; he was therefore a necessary party thereto (Story's Eq. Pls. sec 72) and not having been made a party in said suit, he is not bound by said decrees.

But it is further admitted by the demurrers, that said Edwards became the purchaser of said land under his decree at the price of nine thousand dollars, which was nearly one thousand dollars in excess of the amount of his decree, and this excess he has never paid, and that the same still remains in his hands for the benefit of the plaintiffs.

It cannot be denied that a trust having been created and charged on the said land, subject to the payment of said purchase-money, attaches with equal force to that portion of the proceeds of the sale thereof, which may remain after paying off said purchase-money, with the costs of any suit to enforce the payment thereof.

The plaintiffs may therefore in case said proceedings be held valid, maintain their said bills to reach the said trust-fund remaining in the hands of said Edwards, and have the same administered by the court of chancery according to their several interests therein.

We are of opinion that the decree of the circuit court of Kanawha county rendered on the 15th day of December, 1881, whereby it sustained the defendants' demurrers, to the plaintiffs' original, amended and supplemental bills, and dismissed the same, is erroneous, and must be reversed.   It is therefore adjudged, ordered and decreed, that the said decree of the circuit court of Kanawha county of the 15th of December, 1881, be reversed and annulled; and this Court now proceeding to enter such decree, as the said circuit court ought to have entered upon said demurrers, it is further adjudged, ordered and decreed that the said demurrers be, and the same are hereby overruled, with leave to the defendants to

answer said bills ; and this cause is remanded to the circuit court of Kanawha county for further proceedings therein to be had, upon the principles hereinbefore laid down.   And it is further adjudged, ordered and decreed, that the said appellees, other than the said administrator of Wm. K. Smith, deceased, do pay to the appellants their costs by them, about the prosecution of their appeal in this behalf expended.

THE OTHER JUDGES CONCURRED.

DECREE REVERSED.