# Authority of the President to Blockade Cuba

Under international law, the President may institute a blockade of Cuba as an incident to a state of war, and conceivably a blockade could also be justified as a necessary measure of defense.

The legality of the blockade could probably be tested by Cuba, by other countries, and by their nationals in the courts of the United States, and Cuba and other countries could raise the legality issue before the United Nations and the Organization of American States. It is not clear whether this issue could be raised before the International Court of Justice.

January 25, 1961

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL[*]

In response to your request, I am transmitting the attached memorandum on the above-entitled subject. In view of the length of the memorandum, I believe it would be helpful to summarize the conclusions reached.

The memorandum concludes that the President is authorized to institute a blockade as an incident to a state of war. However, a blockade is a belligerent act which, as a matter of international law, is ordinarily justified only if a state of war, legal or de facto, exists. Conceivably a blockade could also be justified in circumstances in which the blockading country can establish it to be a necessary measure of defense. Whether the necessary facts required to support such a contention exist, however, is not known to me.

The legality of the blockade could probably be tested by Cuba, by other countries, and by their nationals in the courts of the United States. In addition, Cuba and other countries could raise the issue of the legality of the blockade before the United Nations and the Organization of American States. It is not clear whether this issue could be raised before the International Court of Justice.

\* \* \* \* \*

This is in response to your request for the views of this Office as to the President's authority to declare a blockade, by the naval air forces of the United States, of the ports and coast of Cuba. We first discuss the legal circumstances which have been held to justify the imposition of a blockade, and in this connection the President's authority to act. Next, we consider whether under applicable principles of law a case may be made for a blockade of Cuba. Finally, we consider the question of the forums, both domestic and international, which may be available for challenging the validity of a United States blockade of Cuba. In view of the way in which the question has been put to us, we have not undertaken in any manner to consult with the Department of State, the expert agency in this field.

---

[*] Editor's Note: The matter preceding the asterisks is the cover memorandum to the Attorney General. Assistant Attorney General Kramer signed both the cover and the main memorandum.

## I.

At the outset it should be noted that both courts and commentators are agreed that a blockade involves a state of war; i.e., it is the right of a belligerent alone. Thus, in the *Prize Cases*, 67 U.S. (2 Black) 635 (1862), in which the Supreme Court sustained the power of the President to proclaim a blockade of the ports of the United States seized by the southern states in rebellion, the decision turned on the question whether a state of war existed. As the Court put it: "Let us enquire whether, at the time this blockade was instituted, a state of war existed which would justify a resort to these means of subduing the hostile force." *Id.* at 666. The Court concluded that the military insurrection of the Southern States gave rise to a state of war which "[t]he President was bound to meet . . . in the shape it presented itself, without waiting for Congress to baptize it with a name; and no name given to it by him or them could change the fact." *Id.* at 669. On this basis, the Court held that the President "had a right, *jure belli*, to institute a blockade of ports in possession of the States in rebellion, which neutrals are bound to regard." *Id.* at 671.

Other decisions of the Supreme Court recognize the principle that blockade is an incident of a state of war. In *McCall v. Marine Ins. Co.*, Justice Story, writing for the Court, stated:

> The right to blockade an enemy's port with a competent force, is a right secured to every belligerent by the law of the nations. No neutral can, after knowledge of such blockade, lawfully enter, or attempt to enter, the blockaded port. It would be a violation of neutral character, which, according to established usages, would subject the property engaged therein to the penalty of confiscation. In such a case, therefore, the arrest and restraint of neutral ships attempting to enter the port, is a *lawful* arrest and restraint by the blockading squadron.

12 U.S. (8 Cranch) 59, 65 (1814) (emphasis in original). And in *Olivera v. Union Ins. Co.*, Chief Justice Marshall stated, that "a belligerent may lawfully blockade the port of his enemy, is admitted." 16 U.S. (3 Wheat.) 183, 194 (1818). A forthright statement was made by the Supreme Court of West Virginia in the case of *Grinnan v. Edwards*:

> A blockade, is the exercise of belligerent right; before a blockade can be declared, a war must exist; and a blockade lawfully declared, is conclusive evidence that a state of war exists between the nation declaring such a blockade, and the nation whose ports are blockaded.

21 W. Va. 347, 356 (1883).

International law experts have the same view of the blockade. George Grafton Wilson, Professor Emeritus of International Law, Harvard University, states: "The term blockade, properly used, involves a state of war." 4 *Encyclopedia Americana* 98d (1958). In the seventh edition of *Oppenheim's International Law*, edited by the late Professor Lauterpacht (subsequently a judge of the International Court of Justice), it is stated:

> Blockade is the blocking by men-of-war of the approach to the ene-my coast, or a part of it, for the purposes of preventing ingress and egress of vessels or aircraft of all nations. . . . Although blockade is . . . a means of warfare against the enemy, it concerns neutrals as well, because the ingress and egress of neutral vessels are thereby in-terdicted, and may be punished.

2 *id.* at 768 (1952). In a fairly recent article, a blockade is described as the means by which a belligerent cuts off "all access to the coast of the enemy." S.W.D. Rowson, *Modern Blockade: Some Legal Aspects*, 1949 Brit. Y.B. Int'l L. 346, 349. Our own Department of State took the position in 1919 that no blockade could be instituted absent a state of war. In that year, in connection with a proposal that the Allied Governments blockade Bolshevist Russia, it telegraphed the American Commission to Negotiate Peace as follows: "A blockade before a state of war exists is out of the question. It could not be recognized by this Government." *Scope of Blockade*, 7 Hackworth Digest § 624, at 125.

A technical departure from the rule that a blockade can be imposed only as an incident to a state of war is President McKinley's action in 1893. On April 20, 1898, Congress by joint resolution directed the President to use the land and naval forces of the United States to compel the Government of Spain to relinquish its authority over Cuba. Pub. Res. No. 55-24, 30 Stat. 738. In accordance with this resolution, President McKinley, on April 22, 1898, issued a proclamation institut-ing a naval blockade of the north coast of Cuba. 14 *Compilation of the Messages and Papers of the Presidents* 6472 (James D. Richardson ed., 1909). It was not until April 25, 1898, that Congress declared that a state of war with Spain existed. Pub. L. No. 55-189, 30 Stat. 364 (1898). In the declaration it was stated, however, that a state of war had existed since April 21, 1898. *Id*. This was, of course, prior to the date of the blockade. At best, the departure from the established rule was only a technical one.

The other incident that is worthy of note is President Truman's order in 1950 blockading Korea. On June 30, 1950, President Truman announced that "[i]n keeping with the United Nations Security Council's request for support to the Republic of Korea in repelling the North Korean invaders and restoring peace in Korea," he had authorized the United States Air Force "to conduct missions on specific military targets in northern Korea wherever militarily necessary, and had ordered a naval blockade of the entire Korean coast." White House Statement

Following a Meeting Between the President and Top Congressional and Military Leaders to Review the Situation in Korea, *Pub. Papers of Pres. Harry S. Truman* 513 (1950). It should be observed that, under Article 42 of the United Nations Charter, the Security Council is authorized "to take such action by air, sea or land forces as may be necessary to maintain or restore international peace," and a blockade by Members of the United Nations is expressly included among the permissible actions. The Korean blockade is not a precedent here. There the blockade was authorized by the United Nations; in the instant case, as we understand it, the United States would proceed unilaterally. Moreover, it would appear that the Korean blockade was justified under the traditional rule that such action can be taken only in connection with a state of war. There was a de facto state of war between North Korea and the United Nations.

Mention should also be made of what is termed a "pacific blockade." This is said to be "a blockade during time of peace"; it has been used by several European nations "as a compulsive means of settling an international difference." 2 *Oppenheim's International Law* at 144–45; Wilson, 4 *Encyclopedia Americana* at 98d. There appears to be some question, however, as to whether a pacific blockade is a permissible form of international conduct. Professor Hyde states:

> Such action is to be deemed pacific merely in the sense that the blockading State is disposed to remain at peace, while the State whose territory is blockaded does not elect to treat the operation as one constituting an act of war or as compelling it to make war upon its adversary.

2 Charles Cheney Hyde, *International Law, Chiefly As Interpreted and Applied by the United States* § 592, at 179–80 (1922). Professor Hyde notes that, while on certain occasions European countries have found it possible to resort to blockade without producing a state of war, the United States "has never had recourse to pacific blockade." *Id*. at 180. Moreover, the United States appears to have taken the position that a pacific blockade does not authorize the blockading state to interfere with United States shipping. *Id*. at 180–82.

Assuming the existence of a state of war, both practice and authority indicate that the President, in the exercise of his constitutional power as Commander in Chief, can order a blockade of the enemy. President Lincoln took such action in 1861, and his authority was sustained in the *Prize Cases*, 67 U.S. (2 Black) 635 (1863). President Truman took similar action in Korea. With respect to the latter, it has been said that the blockade "was supported and respected by other Members [of the United Nations] except the members of the Soviet bloc." Leland M. Goodrich & Anne P. Simons, *The United Nations and the Maintenance of International Peace and Security* 481 (1955).

## II.

The United States is not in a state of war with Cuba in the traditional sense. From the facts available to us, it does not appear that Cuba has resorted to military action against the United States or that the United States has resorted to such action against Cuba. Nor has Congress declared that a state of war exists between the United States and Cuba. Accordingly, the principles of international law, as presently developed and followed by the United States, would seem to furnish no legal justification for the imposition by this government of a blockade of Cuba. Moreover, to the extent that a pacific blockade is a permissible instrument of international conduct, resort thereto by the United States would apparently represent a reversal of United States policy. A further obstacle in this regard is that the blockaded state must also choose not to regard the blockade as an act of war. We are not in a position to judge whether this course would be followed by Cuba.

In this posture, we turn to the question whether it is, nevertheless, possible to argue that a blockade of Cuba is justifiable. That the United States is engaged in a "cold war" with major communist nations and with Cuba is plain. To keep communist imperialism from engulfing the United States is a matter of vital national interest. As one author has put it, with respect to United States policy to further this interest, and also to keep Axis aggression from American shores during World War II:

> Interventions undertaken to further these interests were lawful if those who authorized them believed that intervention was a last re-sort to safeguard the nation from extreme peril and proper means of intervention were used. . . .

Doris A. Graber, *Crisis Diplomacy: A History of U.S. Intervention Policies and Practices* 211–12 (1959).

An example of the exercise of presidential power of this nature in the naval field is the action of President Roosevelt in 1941, when Nazi power was at its zenith and the peril to the United States great. On July 7, 1941, the President sent a message to Congress announcing that as Commander in Chief he had ordered the Navy to take all necessary steps to insure the safety of communications between Iceland and the United States as well as on the seas between the United States and all other strategic outposts and that troops had been sent to Iceland in defense of that country. The President justified these actions on the ground that the United States could not permit "the occupation by Germany of strategic outposts in the Atlantic to be used as air or naval bases for eventual attack against the Western Hemisphere." *Memorandum on the Authority of the President to Repel the Attack in Korea*, 23 Dep't of State Bull. 173, 175 (1950).

If the President is satisfied, on the basis of the facts known to him, that the Cuban situation presents a grave threat to the safety of the free nations of the

Western Hemisphere, as for example, that they are in imminent danger of attack from hostile forces stationed in Cuba or en route to Cuba from communist countries, it is arguable that, whatever the earlier history of the doctrine of blockade, that concept ought to be accommodated to the situation in hand, not as a device of making war but as a reasonable and internationally permissible means of preventing aggression against peaceful nations. Whatever the facts mobilized to justify a blockade, they would receive careful scrutiny in the forums in which the legality of the action is open to challenge. In addition, the reaction of world opinion would depend upon the strength of the factual justification for the action. We are not, of course, in any position to know what the actual facts are which could be relied upon as justification, and therefore we cannot possibly assess the strength of the possible factual justification.

### III.

This portion of the memorandum discusses which forums may be available for challenging the validity of a blockade of Cuba.

### A. Domestic Forums

In the *Prize Cases*, 67 U.S. (2 Black) 635, 665 (1863), involving the blockade of southern ports during the Civil War, the Supreme Court stated that "[n]eutrals have a right to challenge the existence of a blockade de facto, and also the authority of the party exercising the right to institute it." There several neutral vessels were captured and brought in as prizes by public ships of the United States. Libels were filed by the proper United States Attorneys, and in each such case the United States district court pronounced a decree of condemnation on the ground that the ships had broken or were attempting to break the blockade. The owners of the ships appealed from these decrees. And, as pointed out above, the Supreme Court held the blockade to be a proper exercise of power by the United States as a belligerent. This method of challenging the validity of a blockade would appear to be available to neutral ships today. If such ships are captured on the ground that they were attempting to break the Cuban blockade, they could be treated as prizes and placed within the prize jurisdiction of the federal district courts, provided the captures could be deemed to have been made "during war." 10 U.S.C. §§ 7651, 7652 (1958).[1]

If the vessels were not placed under prize jurisdiction by the United States itself, the ship and cargo owners would not have that avenue of access to our courts. *Ling v. 1,689 Tons of Coal*, 78 F. Supp. 57 (W.D. Wash. 1942). However, in addition to suits in admiralty against the United States under 28 U.S.C. § 1333

---

[1] Section 7651 provides that the prize jurisdiction of the federal courts "applies to all captures of vessels as prize during war by authority of the United States or adopted and ratified by the President."

(1958), they and others claiming loss by reason of the blockade might be authorized to file suits "founded . . . upon the Constitution" in the Court of Claims pursuant to 28 U.S.C. § 1491 (1958), or, in certain cases, the district courts, pursuant to 28 U.S.C. § 1346 (1958). Furthermore, the blockade might give rise to litigation in domestic courts exclusively between private parties owing to its interference with rights under contracts or with other rights. The domestic remedies available for challenging the validity of the blockade would be open to all neutral countries and their nationals, including those of the Communist bloc. In the absence of a state of war, it might also be possible for Cuban nationals to resort to our courts for the purpose of testing the legality of the blockade.

## B. International Forums

In addition to the courts of the United States, a number of international forums appear to be available in which the legality of the blockade as a matter of international law could be raised. It appears that this question could properly be brought before (1) the Security Council and General Assembly of the United Nations and (2) the Organization of American States. It is unclear whether it could be raised before the International Court of Justice.

1. The Charter of the United Nations is a collective treaty concluded for the purpose of safeguarding peace, and provides a means for investigating and determining complaints of alleged aggressive action by a member of State. In our opinion, the procedure provided by the U.N. Charter for these purposes would be available to Cuba and other nations affected by the blockade.

The matter could be brought either before the General Assembly or the Security Council. The former, however, is empowered only to discuss problems and make recommendations to the member nations and to the Security Council. U.N. Charter arts. 10–12. Chapter VII (arts. 39–51) deals with action respecting threats to the peace, breaches of the peace and acts of aggression. It provides that "[t]he Security Council shall determine the existence of any threat to the peace . . . or decide what measures shall be taken in accordance with Articles 41 and 42, to maintain or restore international peace . . . ." (art. 39). The Security Council is authorized to decide "what measures not involving the use of armed forces are to be employed to give effect to its decisions"; and it may call upon members of the United Nations to apply such measures, including various economic sanctions and severance of diplomatic relations (art. 41). As noted earlier, in the event these measures prove to be inadequate, the Security Council may resort to other action to restore peace, including "blockade, and other operations by air, sea, or land forces of members of the United Nations" (art. 42). For this purpose, the Security Council may call on all members of the United Nations to contribute to the maintenance of international peace with armed forces, assistance and facilities (art. 43). The Charter also provides that nothing in it shall impair the inherent right of individual or collective self-defense if an armed attack occurs against a Member

of the United Nations, until the Security Council has taken the measures necessary to maintain international peace (art. 51).

It seems reasonably clear that in providing that the Security Council may take action to deal with threats to peace, including specifically blockade measures, the members of the United Nations intended that such action should not be taken unilaterally except as provided by Article 51 (where the individual member suffering an armed attack may take such action in self-defense). That the United States, England and France have so construed the U.N. Charter is demonstrated by the position taken by these nations in bringing to the attention of the Security Council the threat to peace created by the Soviet blockade of West Berlin. It was claimed that the Soviet blockade was a method used for the expansion of its power in disregard of its responsibility under international agreements, and that it constituted duress and threat of force wholly inconsistent with the obligations imposed on members of the United Nations by the Charter.[2] The Security Council was requested to remove the threat to peace,[3] and it took jurisdiction over the matter. However, the Security Council failed to adopt the resolution offered by the Allied Powers because of the Soviet veto. U.N. Doc. S/1048 (Oct. 22, 1948); 1948–49 U.N.Y.B. 286, U.N. Sales No. 1950.I.11.

Another case involved the Egyptian blockade of the Suez Canal to prevent goods from reaching the State of Israel. Egypt claimed that the Egyptian-Israel Armistice Agreement of 1949 did not end but merely suspended hostilities, that its belligerent rights were left intact, and that it was legally justified in imposing restrictions on the free use of the Canal. When attempts to mediate the dispute failed, Israel brought the matter up for consideration by the Security Council. On September 1, 1951, the Security Council passed a resolution which called upon Egypt "to terminate the restrictions on the passage of international commercial shipping and goods through the Suez Canal wherever bound and to cease all interference with such shipping beyond that essential to the safety of shipping in the Canal itself and to the observance of the international conventions in force." S.C. Res. 95, U.N. Doc. S/RES/95 (Sept. 1, 1951). When Egypt defied the Security Council, the Government of Israel brought the matter up again before the Security Council. 1954 U.N.Y.B. 62, U.N. Sales No. 1955.I.25. On March 19, 1954, a draft resolution was placed before the Security Council which called upon Egypt, "in accordance with its obligations under the Charter to comply" with the 1951 resolution. U.N. Doc. S/3188. Eight members of the Security Council, including the United States, voted for it, but the Soviet Union vetoed the resolution. 1954 U.N.Y.B. 74.

---

[2] Statement by Philip C. Jessup, Deputy U.S. Representative in the Security Council, *Review of Allied Action on Berlin Blockade*, 19 Dep't of State Bull. 541 (Oct. 31, 1948).

[3] *Id.* at 547; Statement by Philip C. Jessup, Deputy U.S. Representative in the Security Council, *The United Nations and Specialized Agencies: U.S. Urges Acceptance of Draft Resolution on Berlin Crisis*, 19 Dep't of State Bull. 572 (Nov. 7, 1948).

Thus it would appear to be fairly clear from these incidents that blockade measures taken unilaterally by a nation, other than in self-defense or in a war, and outside the framework of the United Nations Charter, are likely to be brought before, and considered by, the Security Council. Whether the blockade was undertaken as a justifiable measure of self-defense would obviously be the issue in the instant situation. Of course, any proposed action in the Security Council would be subject to the veto power of the United States.

2. The Organization of American States ("OAS"), of which both the United States and Cuba are members, is also a forum in which the legality of a Cuban blockade could be subjected to investigation and determination. Although there is no express reference to blockade in the OAS Charter, there are many provisions designed to bar unilateral action by any member constituting a threat to the common peace. *See id.* arts. 13, 16–18, 24–25, Apr. 30, 1948, 2 U.S.T. 2416, T.I.A.S. No. 2361, 119 U.N.T.S. 3.[4]

Article 25 provides that in the event of aggression endangering the peace of America, the member States shall apply the measures and procedures established in the special treaties on the subject. The pertinent "special" treaty for security purposes appears to be the Rio Pact,[5] which is closely linked with the Charter. Under the Rio Pact, an Organ of Consultation (meeting of Foreign Ministers) shall gather "without delay" (art. 3) in case of an armed attack, and "immediately" (art. 6) if the integrity or political independence of any American state should be affected by an act of aggression or by any fact or situation that might endanger the peace of America.

The Organ is to decide, by two-thirds vote (art. 17) "the measures which must be taken" for the common defense and preservation of peace (art. 6). Decisions are binding upon all states, except that no state can be required to use armed force without its consent (art. 20). The measures agreed upon by the Organ shall be executed through procedures and agencies in existence or those which may be created (art. 21). It would seem clear that in the circumstances here involved the OAS would be authorized to determine whether a blockade is an act of aggression.

In its relationships with Cuba, the United States has stated that "the proper forum for the discussion of any controversies between the Government of Cuba and the governments of other American Republics is the Organization of American States." *Security Council Considers Cuban Complaint: Statement of July 18*, 43 Dep't of State Bull. 199, 199 (Aug. 8, 1960) (statement of U.S. Representative Henry Cabot Lodge) ("Lodge Statement"). On June 27, 1960, the United States Government submitted to the Inter-American Peace Committee a memorandum entitled *Provocative Actions of the Government of Cuba Against the United States*

---

[4] The text of the OAS Charter appears in 18 Dep't of State Bull. 666 (May 23, 1948).

[5] Inter-American Treaty of Reciprocal Assistance, *opened for signature* Sept. 2, 1947, 62 Stat. 1681, T.I.A.S. No. 1838, *reprinted in* 17 Dep't of State Bull. 565 (Sept. 21, 1947).

*Which Have Served to Increase Tensions in the Caribbean Area*, U.N. Doc. S/4388 (July 15, 1960), *reprinted in* 43 Dep't of State Bull. 79, 79 (July 18, 1960). This memorandum, which sets forth many provocative acts of Cuba in contributing to international tension, was in response to requests made by the Peace Committee under a study assignment given to it by the American Foreign Ministers in 1959. *Id.*; *American Foreign Ministers Conclude Santiago Talks*, 41 Dep't of State Bull. 342, 343 (Sept. 7, 1943); Lodge Statement, 43 Dep't of State Bull. at 199.

The United States Representative to the Security Council has taken the position that the Security Council of the U.N. should take no action on the Cuban complaint until discussions of the problem have taken place in the Organization of American States and an attempt to resolve it has been made in that forum. Lodge Statement, 43 Dep't of State Bull. at 200. In Mr. Lodge's opinion, the procedure was to go to the regional organization first and to the United Nations as a last resort. In the event the United States undertook the action here considered, presumably the OAS machinery would be available to Cuba as it has been to the United States.

3. It is unclear to what extent the International Court of Justice would have jurisdiction to pass upon the legality of the blockade.

It seems doubtful whether the Court could accept jurisdiction if Cuba sought to institute an action against the United States. In filing its acceptance of the compulsory jurisdiction of the Court, the United States has agreed (except for its reservation on domestic matters[6]) to be bound only "in relation to any other state accepting the same obligation." Statute of the International Court of Justice art. 36(2), June 26, 1945, 59 Stat. 1055, 1060. Cuba has not filed its acceptance of the compulsory jurisdiction of the International Court. It would, therefore, appear that Cuba has not accepted the same obligation[7] as the United States, and that an essential condition is lacking for the Court's exercise of compulsory jurisdiction over the United States in a case which Cuba is the plaintiff.

However, even if the validity of the blockade cannot be decided by the Court in on action to Cuba, it is possible that the question is subject to adjudication in a suit

---

[6] On the basis of the reservation, the United States could defeat the jurisdiction of the court merely by asserting that a blockade of Cuba involved a domestic matter.

[7] Oliver J. Lissitzyn, in *The International Court of Justice: Its Role in the Maintenance of International Peace and Security* (1951), indicates the bases of the Court's jurisdiction as follows:

> The jurisdiction of the Court over disputes submitted to it as contentious cases rests in principle on the consent of the parties. This consent can be given either (1) by a declaration recognizing as compulsory the jurisdiction of the Court, with or without limitation, under the "optional clause" of Article 36 of the Statute, or (2) by an undertaking in any other form to recognize as compulsory the jurisdiction of the Court with respect to a class of existing or future disputes, or (3) by an express or tacit agreement to submit a particular dispute to the Court.

*Id.* at 61.

by a third state which is adversely affected by the blockade and which has accepted compulsory jurisdiction. In addition it should be noted that Article 96 of the United Nations Charter provides that the General Assembly or the Security Council may ask the Court for an advisory opinion "on any legal question," and that the Assembly may authorize other organs, or specialized agencies to do so. Thus, although a state is not authorized to request an advisory opinion, it may persuade one of the designated organs to make the request.

However the matter is presented, a basic problem for the Court would be whether a blockade raises a political or a legal issue. The U.N. Charter provides that "legal disputes" should as a general rule be referred by the parties to the International Court of Justice in accordance with the provisions of the Statute of the Court (art. 36). The implication is that "political questions," unlike "legal questions," should not, therefore, be decided by the Court. What is a legal, as opposed to a political, question presents an extremely difficult issue. *See* Lissitzyn, *supra* note 7, at 74. No case of a blockade appears to have been presented to the Court. The closest precedents are the Corfu Channel Case, *id*. at 78–81, in which Albania's action in laying a clandestine minefield was treated as a legal question within the jurisdiction of the Court, and the Fisheries Case (U.K. v. Nor.), Judgment, 1951 I.C.J. 116 (Dec. 18), in which the Court accepted jurisdiction over a dispute between Norway and the United Kingdom as to whether Norway had the right to reserve to its nationals fishing rights in certain areas off the Norwegian coast. These precedents do not appear necessarily to control the question presented by a blockade. In addition, it is of significance that no attempt has been made to bring either the Berlin blockade or the Egyptian blockade of Israel before the Court.

ROBERT KRAMER
*Assistant Attorney General*
*Office of Legal Counsel*